*691 OPINION OF THE COURT
Joseph Kevin McKay, J.
Introduction
“It is abhorrent to our sense of justice and fair play to countenance the possibility that someone innocent of a crime may be incarcerated or otherwise punished for a crime which he or she did not commit.”[1] With this principle in mind, I find that defendant’s 1997 statement to the sentencing court,[2] although simple in tone, now speaks volumes: “I feel sorry for Mr. Joseph [deceased’s] family but I didn’t do it, that’s all I have to say.” (Sentence transcript, May 7, 1997, at 9.) Those words sounded hollow to the sentencing court in 1997, for understandable reasons to be discussed in this opinion, but they have the resounding ring of truth to the court today.
Defendant, who was 16 years old at the time of the crime, has moved pursuant to CPL 440.10 for a vacatur of his judgment of conviction based on jury verdicts for murder in the second degree and criminal possession of a weapon in the second degree and the vacatur of his concurrent sentences of 25 years to life and of 71/2 to 15 years imposed on May 7, 1997. His well-drafted papers were originally submitted to the court pro se, and superseded by a meticulous and well-documented set of motion papers prepared by counsel[3] after her appointment to represent him on this motion. An evidentiary hearing was conducted over the course of a two-week period, from April 13 to April 24, 2009. It was based on defense counsel’s voluminous set of moving papers, to which the District Attorney responded, not in writing,[4] but by consenting to this hearing, without making any specific concessions regarding the merits of the motion. Defendant bases his CPL article 440 application to vacate his judgment of convictions on four interrelated claims: (1) ineffective assistance of trial counsel; (2) actual innocence; (3) newly discovered evidence; and (4) prosecutorial misconduct.
*692 The first two claims are the most powerful. Indeed, in the prosecutor’s post-hearing memorandum, the defendant’s first claim, ineffective assistance of trial counsel,[5] was conceded, which conclusion, after careful consideration, was adopted by this court, leading me to enter an order dated July 9, 2009[6] granting defendant’s motion on that ground. Further, based on the People’s representation that it would be impossible to re-try defendant, the indictment was dismissed on consent. In that order, the court specifically reserved decision on the other claims made by defendant in his motion. Now, as limited by counsel during oral argument on July 9, 2009, the court only decides the merits of the second claim, to wit, actual innocence, although references to defendant’s ineffective assistance of trial counsel claims, newly discovered evidence and some failures and excesses of the prosecution must necessarily be incorporated in this analysis.
Summary of Evidence at Trial and Hearing
The Trial
The substance of the People’s case at trial was the testimony of an alleged eyewitness, Sandra Woodard,[7] and an acquaintance of defendant named DaShaun Reed, as well as the testimony of the medical examiner and that of a detective who recovered the murder weapon, a .32 caliber pistol, from a garbage bag outside of the building where the fatal April 20, 1996 nighttime shootings took place, 153 Marcus Garvey Boulevard in BedfordStuyvesant, Brooklyn. Woodard said she saw defendant confront the deceased,[8] Joseph Foster, at the door of the elevator in the lobby of that building, and after arguing about money and “stuff,” she saw defendant pull out an object, point it close to the deceased, then she heard shots fired and saw Foster fall *693 down and cry for help.[9] Defendant threatened her as he was leaving the scene. He exited through the back door of the building to the outside. She then went out the front door and called 911 from a pay phone.
Reed testified that he and his cousin Dre (Andre Reed) encountered defendant as he raced up the back stairs[10] between the first and second floors of that same building right after shots were fired, that defendant expressed regret for what he had just done, and that he and Dre then went with defendant into an unspecified second floor apartment. Reed also testified that he witnessed two incidents years earlier involving defendant’s hitting the deceased with a bat and the deceased weeks later retaliating by slashing defendant on the side of his face.* [11] Reed made the case against defendant even stronger at trial by testifying further that on the morning of April 20, defendant pointed to his facial scar in a local pizza parlor and announced to all within earshot that he was, in effect, seeking revenge.[12] Finally, Reed testified that the next morning he heard defendant state that his (defendant’s) mother threw the murder weapon down the house garbage compactor chute. He reported this to the police, who were able to recover the murder weapon from a garbage bag outside of the building.
*694 DaShaun Reed’s Hearing Testimony At the hearing, Reed recanted every piece of this incriminating evidence, as he placed himself, not at the scene, but driving back to Brooklyn from the Bronx at the time of the shooting, which he learned about later that morning from Dre. While his recantation is more believable to the court than his implausible trial testimony, he failed to give any credible reason why he lied at trial and why he was now recanting. However, despite this lack of candor, much of his hearing testimony was supported by other evidence and it also served to eliminate conflicts with Woodard’s testimony. Standing alone, this recantation would be of dubious probative value.[13] In the context of the trial and the hearing testimony, however, even this recantation undermines the case the People presented at trial and tends to support defendant’s actual innocence claim.[14]
The Actual Innocence Claim The Alibi Defense at the Hearing Including defendant himself, there were four witnesses who testified to defendant’s alibi, and two additional supporting witnesses who corroborated parts of the alibi but not at the very moment of the shooting of Foster in the lobby of 153 Marcus Garvey Boulevard.[15] In sum and substance the alibi witnesses testified to being on an elevator with defendant and hearing shots fired as it ascended to the fourth floor of that building, which was the home of defendant and members of his family, on the night of April 20, 1996. Defendant recalled hearing the shots as he rushed with the others from the elevator down the fourth floor hallway to his apartment, 4G. They all explained that they *695 had just left a nearby party celebrating defendant’s two-year-old niece’s birthday.[16] Without any hint of rote adherence to a script, each of the witnesses testified credibly and consistently to essential facts of the alibi, the preceding family party, the shots heard in the ascending elevator or in the fourth floor hallway, and gathering in apartment 4G.
Except for the cross-examination of defendant, to be treated separately, not one telling point was raised on the cross-examination of these witnesses to shake their testimony or damage their credibility. On the contrary, the credence of their accounts of the incident was significantly enhanced by the fact that several of these witnesses appeared in defense counsel’s office well before trial and related essentially the same exculpatory facts.[17] This was established not only by their own hearing testimony, but also by notes which appellate counsel obtained from trial counsel’s file, although trial counsel professed to have virtually no memory of these or any other facts of this case.[18]
The overriding theme struck by the prosecutor on cross-examination of each defense hearing witness was their failure to take any decisive remedial action when defense counsel rested without calling any of them as witnesses at trial. They were repeatedly asked why they did not complain to the court or more vociferously complain to the defense attorney and why they remained inactive until the instigation of this CPL article 440 motion years later. While this may have been a legitimate avenue of inquiry, the challenging and repeated nature of the *696 questioning along this line demonstrated to the court a lack of appreciation for the palpable powerlessness felt by each of these witnesses, who were for the most part unsophisticated and unschooled in the ways of the criminal justice system.[19] Their failure to do more was quite understandable under the circumstances, and in the eyes of the court in no way damages the strength or veracity of their testimony. Because of late notice of alibi[20] and defense counsel’s decision not to call any of them, which was never adequately explained, it is most unfortunate, but understandable, that the prosecutor never interviewed them.[21]
Defendant’s Testimony at the Hearing Defendant did not testify at trial, but he did testify at the hearing. His direct testimony was fairly straightforward and consistent with his other alibi witnesses, but by no means did I perceive it to be a rehearsed recitation of the accounts of others.[22] On cross-examination the prosecutor certainly scored points by emphasizing defendant’s incorrigible and criminal conduct as a youth in his own community before the shooting and in prison, most of which conduct defendant had already candidly admitted on direct examination.[23] These serious negatives did not establish to me that he was lying at the hearing, although without the bolstering of his testimony by his many supporting witnesses, his credibility and his case would have been more problematic.
*697 Trial Counsel
Defendant’s trial counsel was appointed from the County Law article 18-B homicide panel to represent defendant. He has been a member of that panel since 1987. He appeared at defendant’s arraignment in Supreme Court on May 9, 1996 and continued his representation through trial, verdict, sentence and the filing of a notice of appeal. He is an experienced criminal trial attorney and has tried hundreds of serious felony cases, including many homicides.
His cooperation with defendant’s current counsel was in my view extremely reluctant. He repeatedly claimed to have no recollection of this case whatsoever during telephone communications with Ms. Fahey and the District Attorney’s Office and on the witness stand at this hearing.[24] During the hearing he insisted, as previously noted, that neither the exhibits nor the trial testimony that was brought to his attention refreshed his recollection,[25] although in matters of record he agreed he had no basis to dispute them.[26]
Fortunately, trial counsel’s notes, which were copied and given to appellate counsel when the first direct appeal was being prepared in 1998, enabled the parties and the court to reconstruct some of the pretrial events, which turned out to support the hearing testimony of family members of the defendant regarding their coming forward at a very early time with the same exculpatory account they gave at the hearing. Still, trial counsel’s professed near-total memory failure made it difficult, *698 if not impossible, to determine the reasons for the many decisions and apparent mistakes he made, all of which proved disastrous for the defense at trial, the chief one being his failure to call the alibi witnesses.[27] His many other mistakes and failures went similarly unexplained and in the court’s view cannot be justified.[28] For example, there is no evidence that counsel ever hired an investigator or visited the scene and there are strong inferences, which I accept, that he did neither.[29] These and other demonstrated failures by the defense at trial, recited in the post-hearing memoranda of both sides, made it easier for the court and jury in 1997 to overlook the deficiencies in the prosecutor’s case, thereby paving the way for the guilty verdicts which the court now labels a miscarriage of justice.
Deficiencies of the Prosecution
Defendant’s direct evidence of actual innocence must be juxtaposed with and viewed in light of the glaring weaknesses in the People’s case — admittedly less evident at trial because of the ineffectiveness of defendant’s trial counsel, as exposed more fully at the hearing. For example, prior statements of Sandra Woodard, the lone eyewitness, to Detective Lawrence and on audiotape to an Assistant District Attorney, described a shooting dramatically different from her trial testimony.[30]
I have no doubt that the trial Assistant District Attorney believed in her case against defendant and pursued the prosecution as a formidable advocate for the People. My criticism is *699 that the prosecutor too readily embraced the case handed to her by the police and the witnesses and ignored strikingly inconsistent prior statements and other leads that called into serious question the merits of the prosecution’s case.[31] The District Attorney’s responsibility was much greater than advocating for the People and seeking a conviction; it was first to do justice.[32]
As previously noted, the alibi witnesses, the only significant affirmative evidence in defendant’s favor, were essentially kept under wraps by defense counsel until trial, so the prosecution can hardly be faulted for not reaching out to interview them and for not investigating the alibi in 1997. However, it ill behooves the prosecutor to now blame the defense, as was argued in the post-hearing memorandum, for not proving at this hearing that another figure prominently mentioned in the hearing as a major, convicted drug dealer and violent felon in the same housing project, one Michael Kirkland, ordered the hit on Foster, possibly executed by Reed’s cousin Dre,[33] another often-mentioned shady character at those houses, and also that Kirkland orchestrated the frame-up of defendant for Foster’s murder. It seems to this court that the foregoing is a plausible and even likely scenario to explain all these events, although it was not proved by anything close to admissible evidence sufficient to prosecute Kirkland.[34] But the time to have begun an investigation into Kirkland’s involvement and any other person’s criminal responsibility for this murder was in April *700 1996, and those responsible for pursuing this investigation should have been the police and the District Attorney. In the final analysis, defendant has no onus to prove who actually killed Foster, even while he assumes the burden of trying to establish his own actual innocence.
I do not conclude that the trial prosecutor’s failures amounted to misconduct or constituted a “due process” violation of defendant’s rights. Indeed, at oral argument after submission of post-hearing briefs, the defense did not press that claim. And there is general agreement that, since everything in the prosecutor’s possession favorable to defendant was disclosed to the defense, it was mainly the ineffective assistance of counsel which crippled the adversarial fact-finding process. Nevertheless, the prosecutor’s failure to investigate and, to a lesser extent, her conduct at trial can be faulted and, I believe, contributed to this miscarriage of justice.
In the area of investigative failures, I note a total failure to connect the evidentiary dots concerning the one and only true caller about this homicide to 911. There was sufficient documentary and audiotaped evidence available well before trial for the police and the prosecutor to have learned, as was clearly established at the hearing, that it was a female tenant in a second floor apartment of the same building, Judy Gregory, who made that call. Once that was known, other salient facts would have emerged, such as that Sandra Woodard must have been lying about calling 911, and further that it would have been highly unlikely for the People’s other main witness, DaShaun Reed, to have encountered defendant on the (back) stairs and in the second floor hallway right after the shooting without being noticed by Gregory and her guest Sarita Brevard.[35]
Further, it now seems plain to the court that virtually no police or prosecutor in-depth investigation was done into the character and credibility of the People’s main witnesses. While much of the scandalous information referred to at the hearing *701 about Reed and Woodard was in the form of general knowledge and reputation in the community, it is hard to believe that with a little effort the police and prosecutor would not have uncovered enough negative information to cause them to doubt the merits of the case against defendant.
What I characterize as prosecutorial excess at trial is highlighted in the summation argument that Woodard never wavered concerning her identification of defendant, whom she knew from living in the same building, as the shooter,[36] despite her blatantly inconsistent prior statements to Detective Lawrence and to an Assistant District Attorney under oath on audiotape. (See n 30, supra.) As far as I am concerned, it is a wholly inadequate answer for the prosecution to argue now that it was enough to disclose the inconsistent statements to defense counsel and that the trial record, in part, supported her summation argument.[37] The prosecution’s obligations go further than that.[38]
*702 The Law Regarding Actual Innocence Claims Raised in CPL Article 440 Motions
This court acknowledges that as of yet no New York appellate court has expressly recognized “actual innocence”[39] as a ground under CPL 440.10 (1) (h).[40] However, I am now prepared to rule that, at least under the circumstances of this case, such a claim of actual innocence[41] may be brought and the standard of proof for determining it is “by clear and convincing evidence.”[42] (See People v Cole, 1 Misc 3d 531, 543 [Sup Ct, Kings County 2003]; Cornell v Nix, 119 F3d 1329, 1332 [8th Cir 1997]; Ex Parte Elizondo, 947 SW2d 202, 209 [Tex Crim App 1996]; Miller v Commissioner of Correction, 242 Conn 745, 794, 700 A2d 1108, 1132 [1997]; cf Carriger v Stewart, 132 F3d 463, 476-477 [9th Cir 1997].) Moreover, I am more than satisfied that on this evidentiary record defendant has met his high burden and has demonstrated that he was wrongfully convicted for the 1996 murder and weapon possession.[43] On this record, for the court to fail to remedy this injustice or fail to exonerate defendant would be unconscionable. Accordingly, this court now holds that defendant’s judgment of conviction must be vacated on both the previously held ground of ineffective assistance of trial counsel and, *703 in addition, on the ground that defendant has proved his claim of actual innocence. To paraphrase the proposition with which I began this opinion, it would be abhorrent to my sense of justice and fair play to do other than to vacate defendant’s convictions on both grounds and to declare that he is innocent of this horrible murder, and to ensure he does not continue to serve any more time in prison for these convictions.[44]
Judgment of conviction for murder in the second degree and criminal possession of a weapon in the second degree vacated, and the indictment dismissed, nunc pro tunc to July 9, 2009.

. People v Tankleff, 49 AD3d 160, 177 (2d Dept 2007).

. The underlying homicide trial was held before now-retired Justice Herbert Lipp and a jury. Justice Lipp also sentenced defendant.

. Lynn Fahey, Esq., of Appellate Advocates was appointed by the court to represent defendant on this CPL article 440 motion. She also had represented defendant on his direct appeal. (People v Wheeler, 257 AD2d 673 [2d Dept 1999], lv denied 93 NY2d 930 [1999].)

. The prosecutor had earlier answered defendant’s pro se papers in writing, arguing to the court that the motion should be summarily denied.

. See Strickland v Washington, 466 US 668 (1984); People v Benevento, 91 NY2d 708 (1998); People v Baldi, 54 NY2d 137 (1981); People v Droz, 39 NY2d 457 (1976).

. This decision and order was superseded by an amended decision and order of July 16, 2009.

. Woodard died in 2005. Defendant’s moving papers contained a 2007 affidavit from a friend of Woodard claiming she recanted to him and that she was paid drugs for her false testimony. Witness and evidence problems prevented the defense from attempting to prove this at the hearing. As such, this so-called recantation cannot figure in my actual innocence analysis, but it did play a role in my decision to appoint counsel for defendant.

. The deceased was shot three times in the head, two of which bullets penetrated his brain.

. The medical examiner, Dr. Joaquin Gutierrez, testified at trial to the cause of death and at the hearing as well. Specifically asked about the deceased’s ability to speak after two of the shots penetrated his brain, Dr. Gutierrez said that would have been impossible. He also agreed that the position of the deceased on the lobby floor was inconsistent with his being shot three times at the elevator door, but that he must have been several feet away from the elevator when he was shot. (Hearing transcript at 373.)

. Although this account is inconsistent with Woodard’s testimony about the shooter’s exiting the building through the back door, the prosecutor tried to reconcile the accounts by straining to interpret Woodard’s words to have meant he exited through the first of two back doors where the back stairs are located.

. At the CPL article 440 hearing, the defense proved that the bat and slashing incidents occurred in the summer of 1993, nearly three years before the shooting, and faulted the prosecution for eliciting erroneous testimony that these incidents happened one to two years closer in time to the shooting and also criticized the defendant’s trial counsel for not challenging that testimony. I regard these errors as only minor examples of ineffective assistance of trial counsel and overreaching by the prosecutor.

. Prior statements and testimony of Reed placed defendant’s revenge statement on the night before the shooting. The lackadaisical defense attorney and the easily-forgiving prosecutor both ignored this troublesome inconsistency at trial.

. “There is no form of proof so unreliable as recanting testimony.” (People v Shilitano, 218 NY 161, 170 [1916].)

. Neither side has felt comfortable in placing much credence in or reliance on DaShaun Reed’s recantation testimony (which was the basis for the “newly discovered evidence” claim) standing alone, but that means to me that his trial testimony, which I have characterized as implausible, especially judged in light of all the evidence adduced in the CPL article 440 hearing, fares worse. He is presently serving a term of incarceration in New York State prison of 50 years to life for murder and kidnapping convictions, for which he was under indictment when he testified at this trial, and for which he was subsequently convicted and sentenced. (See People v Reed, 2 AD3d 463 [2d Dept 2003], lv denied 1 NY3d 600 [2004], habeas corpus denied sub nom. Reed v Smith, 2006 WL 929376, 2006 US Dist LEXIS 18352 [ED NY 2006].)

. None of these witnesses was called to testify at trial, representing a critical omission of defense counsel to be discussed more fully later in this opinion.

. Defendant’s mother, sister and his sister’s friend testified that they rode in the elevator with defendant and heard gunshots as it was ascending to the fourth floor. The friend also heard the shots as the elevator door opened. Defendant’s cousin, now a Department of Correction captain, testified that she rode up in the elevator right before defendant and his group, and that she heard gunshots while in the fourth floor apartment kitchen, and that she saw defendant and others enter the apartment moments after the gunfire.

. Defendant’s sister, mother, cousin and a family friend all testified that they met with trial counsel in his office (either separately or in groups) within months of the shooting. Other identified people were also in attendance but did not testify at the hearing.

. This memory failure incredibly existed as early as a year after the trial, according to conversations appellate counsel represented she had with him while she prepared the direct appeal in 1998, and persisted even after the trial transcript was made available to him before and during the hearing. Since the ineffective assistance of trial counsel claim was conceded by the prosecution after the hearing, the court will not now catalogue all of counsel’s errors and failures.

. Their common response was that they felt they had to trust the “professional,” the defense attorney, that they did not believe they could complain to the court, and that they later placed some hope in the appeal.

. Although there is some confusion in the trial record, the trial court did not preclude defense counsel from calling alibi witnesses on account of the lateness of the alibi notice.

. It is noted, however, that the District Attorney argued in a written answer in opposition to the original pro se version of this motion that the trial record was sufficient to infer that defense counsel had a plausible trial strategy for not calling the alibi witnesses, a point abandoned by the People after the hearing and, in any event, totally contradicted by the hearing record.

. For example, as noted previously, defendant testified that he first heard shots when he was in the fourth floor hallway, having just exited the elevator. Rather than exposing a fabricated inconsistency, it struck me that this was an honest difference in recollection from many years earlier between defendant and his other witnesses, growing out of fast-moving and startling events of the distant past, more aptly characterized here as a traditional hallmark of truth.

. Defendant is presently also serving concurrent time of 7 to 14 years on an arson conviction, and a consecutive sentence of IV2 to 3 years for a contraband in prison case to which he pleaded guilty.

. Counsel testified to one exception to this memory failure. He remembered defendant’s mother and that she came to the trial every day. “That’s one thing that you don’t forget.” (Hearing transcript at 562.) He did not recall that she was at an office meeting, which his notes showed he conducted with family members before trial regarding the alibi defense. The mother herself testified credibly that she met with counsel at some point before trial. She and other family members also testified that she attended part of the trial, but on account of illness and excitability was not there at the verdict, all of which I accept as true.

. A disturbing example of his failure of memory was his total lack of recall that his client had a prominent scar along the left side of his face, from ear to chin, which the record showed was inflicted in 1993, which is still very visible today and which formed a basis for the prosecutor to argue retaliation as a motive for the fatal shooting in 1996.

. In fact, there were numerous times at the hearing where trial counsel conceded that it would have been helpful to the defense had he pursued certain lines of questioning. For example, he agreed it would have helped the defense to have exploited Woodard’s prior inconsistent statements more effectively (hearing transcript at 452, 483-490) and to have presented expert testimony that Foster would not have been able to speak after gunshots penetrated his brain (hearing transcript at 459-461).

. The explanation given, that, in accordance with his usual practice his decision had to be with the concurrence of defendant and his family, is flatly rejected by the court as contrary to all the credible hearing evidence.

. People v Fogle, 10 AD3d 618 (2d Dept 2004); People v Bussey, 6 AD3d 621 (2d Dept 2004), lv denied 4 NY3d 828 (2005).

. His testimony that he would have done so if necessary regarding the hiring of an investigator or that he would habitually visit scenes of crimes as part of trial preparation is not persuasive in this case.

. It has never been satisfactorily explained how the prosecutor could have ignored the fact that Woodard gave three irreconcilable accounts of the crime. First, she told Detective Lawrence that Foster’s two unidentified assailants confronted her when the elevator door first opened, that the gunman ordered her out, that she argued with him, and as soon as she moved aside, he shot Foster (hearing transcript at 488). Second, she was recorded under oath on audiotape by an Assistant District Attorney that she cringed in the elevator, where Foster’s two unknown assailants could not see her, and that the gunman argued with Foster over money and “stuff’ before shooting him (hearing transcript at 488-489). Finally, before the grand jury and at trial, she claimed that there was only one assailant, whom she recognized from her building as the defendant, and who argued with Foster as she cowered in the elevator before he did the shooting (hearing transcript at 488-489).

. During her hearing testimony, the trial prosecutor placed great emphasis on the circumstance that two witnesses, apparently unknown to one another, both independently identified defendant as the shooter, blind to the risk that yet a third person with enough power and motive may have influenced and suborned the perjured testimony of both.

. The trial prosecutor not only appears to have ignored the many questions and deficiencies in the People’s case described above, but also did her best to oppose and block defense counsel’s admittedly ineffective efforts to expose these deficiencies. These deficiencies were potential leads to uncover the truth. They may not of themselves have caused the District Attorney to dismiss the indictment or decline to indict in the first instance. But they were leads that cried out for investigation; yet no one pursued them — until defendant’s newly appointed CPL article 440 counsel began her investigation in 2008.

. It is curious, as Reed testified at the hearing and as a former supervisor in the Homicide Bureau of the Kings County District Attorney’s Office in part confirmed in his testimony at the same hearing, that it was only after there was an overt threat to have the police pick up Dre that a reluctant Reed finally agreed to testify at the trial.

. According to Reed, Dre was murdered in May 2000 and, as previously noted, Woodard is also deceased. Kirkland’s whereabouts are unknown, but it was established at the hearing that he was a confidential informant of Detec *700 tive Parker (now retired) of the same precinct as the shooting, and that he had motives to have Foster killed and defendant framed.

. Sarita Brevard and Judy Gregory now both live in upstate New York. Brevard testified credibly at the hearing as a defense witness about the observations she made with Gregory in the stairwell and lobby, including hearing the shots and seeing the deceased’s body in the lobby, and then rushing back up the front stairs to Gregory’s second floor apartment where she witnessed Gregory make the 911 call. She also identified Gregory’s near-hysterical voice on the 911 recording, which was played during the hearing. Gregory declined to come to the hearing to testify herself.

. This is a quotation from part of the prosecutor’s summation on this issue:
“And there’s one thing she told us and it has been uncontroverted, she recognized and knew the person who shot and killed Joseph Foster . . . And there’s one thing that she never ever varied from; she was consistent throughout, and that is she knew the man who was in that lobby that morning or that evening and she knew him because she recognized him from the building. She was 100 percent positive. She never varied. She never got off of that because I submit to you she did, in fact, recognize him.” (Trial transcript at 333-334.)

. This part of the trial brings into focus the tragic confluence of ineffective assistance with the overzealousness of the prosecutor. Instead of playing for the jury the audiotape of Woodard’s sworn statements to the Assistant District Attorney made on the early morning of April 21,1996, defense counsel only read from portions of the transcript on cross-examination. Even when he obtained a stipulation from the prosecutor that the transcript was accurate (trial transcript at 61), he did not offer it in evidence. When confronted with her radically different account, Woodard claimed she simply did not remember making such statements or offered an absurd explanation, that the two persons to whom she referred meant defendant and deceased. The jury never heard the taped statements she made, so the prosecutor apparently felt that those inconsistent statements could be ignored or explained away for purposes of summation, thereby compounding defense counsel’s serious failure.

. See Berger v United States, 295 US 78, 88 (1935) (“in a criminal prosecution [the prosecution’s interest] is not that it shall win a case, but that justice shall be done. As such [the prosecutor] is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vig- or — indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper *702 methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one”); Brady v Maryland, 373 US 83, 87 (1963); People v Steadman, 82 NY2d 1, 7 (1993) (“Prosecutors occupy a dual role as advocates and as public officers and, as such, they are charged with the duty not only to seek convictions but also to see that justice is done. In their role as public officers, they must deal fairly with the accused and be candid with the courts” [citations omitted]); People v Pelchat, 62 NY2d 97,105 (1984); People v Rose, 307 AD2d 270, 271-272 (2d Dept 2003).

. See District Attorney’s Office for Third Judicial Dist. v Osborne, 557 US —, 129 S Ct 2308 (June 18, 2009); Herrera v Collins, 506 US 390 (1993).

. “In making our determination, we do not decide the contention, advanced by the defendant, that New York recognizes a free-standing claim of actual innocence that is cognizable by, or which may be addressed within the parameters of, CPL 440.10 (1) (h).” (People v Tankleff, 49 AD3d at 182.)

. The People have rightly stated: “But the Kings County District Attorney’s Office believes that if a defendant can prove his or her actual innocence, the defendant’s continued incarceration would be fundamentally unfair and would, at the very least, violate the New York State Constitution.” (Post-hearing mem of law at 65.)

. Both sides have urged the court to adopt and apply this standard, and I agree that it is the most suitable one.

. It is the District Attorney’s current position that defendant would not be convicted beyond a reasonable doubt at trial based on the evidence adduced at the CPL article 440 hearing, but that the failure of the alibi witnesses to have taken remedial action for so many years so undercuts their credibility that the actual innocence claim was not clearly and convincingly established.

. It is based upon this relentless commitment to justice that the Chief Judge, building on the work of the New York State Bar Association’s Task Force on Wrongful Convictions, has recently formed the “Justice Task Force” to review police, prosecutor, defense and judicial practices in cases where wrongful convictions have been confirmed. (See Stashenko, ‘Serious’ Effort Vowed on False Convictions, NYLJ, July 15, 2009, at 1, col 5.)