08-0297-pr
Friedman v. Rehal

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

_____

August Term, 2008

(Argued: July 8, 2009                                          Decided: August 16, 2010)

Docket No. 08-0297-pr

_____

JESSE FRIEDMAN,

*Petitioner-Appellant,*

—v.—

JOE REHAL, Parole Officer,
ROBERT DENNISON, Chairman of the New York State Division of Parole, and
ANDREW CUOMO, Attorney General of the State of New York,

*Respondents-Appellees.*

_____

Before:

POOLER and RAGGI, *Circuit Judges*, and KORMAN, *District Judge.*[*]

_____

An appeal from a judgment of the United States District Court for the Eastern District of

New York (Seybert, *J.*) which dismissed as untimely a petition for a writ of habeas corpus pursuant

to 28 U.S.C. § 2254.

AFFIRMED. Judge Raggi concurs in part in a separate opinion.

> JENNIFER BONJEAN (Ronald L. Kuby, David Pressman, *on the brief*),
> Law Offices of Ronald L. Kuby, New York, N.Y., *for
> Petitioner-Appellant*.

> JUDITH R. STERNBERG, Assistant District Attorney (Kathleen M.
> Rice, District Attorney, Peter A. Weinstein, Assistant District

_____

[*]     The Hon. Edward R. Korman, of the United States District Court for the Eastern
District of New York, sitting by designation.

Attorney of Counsel, *on the brief*), Nassau County, N.Y., *for Respondents-Appellees*.

EDWARD R. KORMAN, *District Judge*:

This is an appeal from the denial of a writ of habeas corpus in a case in which petitioner who pled guilty seeks habeas corpus relief on the ground that exculpatory evidence was withheld from him. Because his petition was not filed timely, he also argues that his failure to do so should be excused on the ground that he is actually innocent. We affirm the judgment of the United States District Court for the Eastern District of New York (Seybert, *J.*) denying the writ without reaching the latter issues, because we conclude that the grounds asserted in the petition would not justify habeas corpus relief.

## BACKGROUND

We summarize below the facts as alleged in the petition, as well as the affidavits and supporting materials, including the transcript used in the documentary film *Capturing the Friedmans*, and the memoranda of interviews taken in preparation for the film. These materials, some of which were also filed as part of the record in petitioner's post-judgment motion in the Nassau County Court, are included as part of the record in the district court. The District Attorney's submission in opposition to the petition focused principally on whether the petition was timely filed and not on the merits of the allegations in the petition.

### A. The Investigation

In 1982, Arnold Friedman, a retired school teacher, began teaching computer classes to children in his family's home in Great Neck, New York. In September 1984, Arnold asked petitioner, Jesse Friedman, the youngest of his three sons, to assist him in teaching classes. Petitioner

was fifteen years old, and in tenth grade, at the time. Petitioner continued to assist his father until September 1987, when he left to attend college.

After a customs agent intercepted a package containing child pornography addressed to Arnold Friedman, federal agents obtained a search warrant and executed a search of the Friedman home. During the search, they seized a list of names and phone numbers of eighty-one students enrolled in Arnold Friedman's computer classes. Subsequently, Detective Sergeant Fran Galasso, head of the Nassau County Police Department's Sex Crime Unit, sent out two-detective teams to interview students who were currently or formerly enrolled in Arnold Friedman's computer classes about possible abuse.

On November 25, 1987, Arnold Friedman and petitioner were arrested on a felony complaint alleging child sexual abuse. Between December 1987 and November 1988, petitioner was charged with two hundred and forty-three counts of sexual abuse in three separate indictments and arraigned in the County Court, Nassau County (Boklan, *J.*). The indictments originally included allegations from fourteen complainants, all male children ranging in age from eight to twelve years old. Prosecutors had no physical evidence and relied entirely on allegations made by computer students after being questioned by Nassau County detectives. No student had ever complained of abuse, nor had any parent ever observed suspicious behavior, prior to the investigation. Indeed, Assistant District Attorney Onorato acknowledged that "there was a dearth of physical evidence." [*Capturing the Friedmans* Tr. 36, A-316.] Nor was this what he described as "the best case scenario," where "you would like to find videotapes of Mr. Friedman actually sexually abusing the children or at the very least some photographs of some of the children in sort of compromising sexual positions."

Onorato admits that "[w]e didn't find any of that." [Jarecki Aff. ¶ 10 (quoting "DVD Extra Material"), A-429.]

The Nassau County Police Department never produced transcripts, recordings, or videotapes of the student interviews that preceded the indictments. Moreover, because Arnold Friedman and petitioner ultimately pled guilty, the circumstances surrounding the interviews were not explored at trial. Some former students and their parents, however, recall with great consistency that detectives employed aggressive and suggestive questioning techniques to gain statements from children who had attended Arnold Friedman's computer classes. Detectives generally entered an interview with a presumption that a child had been abused and refused to accept denials of abuse. If a child denied being the victim of abuse on a first visit, detectives would often visit the child repeatedly for followup interviews, each lasting as long as four hours, until the child admitted abuse. In one case, detectives visited a child fifteen times and assured the child's mother before the final visit that they were going to stay "as long as it takes." [Kuhn Aff. ¶ 10, A-530.]

Likewise, detectives often insisted that they knew that the child they were interviewing had been abused. For example, detectives would often tell children that Arnold Friedman or petitioner had already admitted molesting them or that other students had claimed to have observed them being molested. As one former student described it,

> I remember that they made specific suggestions to me about things that they believed happened in the computer classes, and that they told me repeatedly that other students in my class had already told them that they had been abused, and that they were certain that in fact I had also been abused and that I should tell them so.

[Brian Tilker Aff. ¶ 5, A-790.] This strategy was designed to force children to agree with the detectives' story. Detective Squeglia, who conducted many interviews in the case, explained in a recorded interview:

4

Well, if you talk to a lot of children, you don't give them an option, really. . . . [Y]ou have to tell them pretty honestly that we know you went to Mr. Friedman's class, we know how many times you've been to the class. You know – we go through the whole routine. We know there was a good chance that he touched you or Jesse touched you or somebody in that family touched you in a very inappropriate way.

[Squeglia Tr., *Capturing the Friedmans* Interview, A-459.]

The detectives would reward cooperative children with "pizza parties" and police badges. When children did not admit to experiencing sexual abuse, however, detectives would persist in their questioning, sometimes taunting the children for failing to offer the desired answers. The tactics were so aggressive that several former students admit that they responded to them by falsely alleging instances of abuse. Although these children were aware that they were lying to the detectives, they ultimately surrendered to the pressure and "remembered" instances of abuse just to "get [the detectives] off [their] back[s]." [*See Capturing the Friedmans* Tr. 99, A-379; Brian Tilker Aff. ¶¶ 8–9, A-790.]

These questioning techniques were used in the police interview of Gary Meyers, a former computer student, which was secretly videotaped by his mother. The videotape portrayed detectives using "hostile techniques," including "suggestive and harassing questioning," while interrogating Meyers, who was then thirteen years old. Throughout the videotape, detectives pressured Meyers to admit that he was sexually abused. Nevertheless, Meyers maintained that he was never exposed to or witnessed any abuse. When Meyers refused to admit sexual abuse, a detective told Meyers's mother that he did not "like his answers" and referred to Meyers as a "wise guy." [*See* Meyers Tr., A-804.] At some point before the third indictment was handed down, either Arnold Friedman or petitioner informed petitioner's attorney, Peter Panaro, about the videotaped interview. Panaro claims that after viewing the videotape, he informed Assistant District Attorney Joe Onorato about

5

it and requested that Onorato provide any evidence of similar "hostile" techniques employed during eyewitness interrogations. The prosecution did not turn over any evidence that detectives used similar techniques during other interviews.

As the detectives continued to aggressively pursue potential victims, the charges against petitioner expanded dramatically in both number and scope. While the first indictment included fifty-four counts, ten of which were against petitioner, the third indictment included three hundred and two counts, one hundred and ninety-eight of which were against petitioner. The allegations also grew increasingly bizarre, sadistic, and even logistically implausible. For example, the third indictment described several group molestation exercises, including "Leap Frog," in which Arnold Friedman and petitioner allegedly sodomized an entire class of naked boys by "leaping" from one to the next.

As the case expanded, members of the Nassau County District Attorney's office also began to speculate that a "sex ring" had been operating from the Friedman home and that other teenagers had been involved. Petitioner alleges that, through great pressure, the District Attorney was able to secure a cooperation agreement from an acquaintance of petitioner, Ross Goldstein, in exchange for a favorable plea agreement. Goldstein had until then vehemently denied any knowledge or involvement. Indeed, more than half of the charges against Goldstein were alleged to have taken place before the petitioner and Goldstein had even met. According to John Roe, who was one of two additional teenagers suspected of involvement in a "sex ring," Goldstein later admitted that he had falsely implicated others under "intense pressure from the police to come up with anything that seemed like cooperation." [Jarecki Aff. ¶ 12 (quoting "DVD Extra Material"), A-430.]

6

Due to the "nature of the charges" and the extent of allegations, "the community [was] in an uproar." [Richard Tilker Aff. ¶ 10, A-787.] The Parent-Teacher Association of Great Neck ("P.T.A.") sponsored letter writing campaigns and community meetings to reach out to former computer students and their families. In December 1987 and January 1988, Great Neck held two community meetings, sponsored by the school district and the P.T.A., designed to advise parents on the community resources available to deal with child abuse. *See* William S. Dobkin, *Great Neck Community Marshals its Resources to Deal with Child Abuse and Child-Sex Crime*, Great Neck Record, Feb. 4, 1988, at 5A. About fifty parents attended the first meeting and about three hundred parents attended the second meeting. *Id.* The meetings presented "expert advice" from such speakers as Detective Sergeant Fran Galasso, Assistant District Attorney Joe Onorato, *id.*, and Dr. Sandra Kaplan, a therapist treating many of the alleged victims in the case. *Id.* The expert advice was simple: every former student should be considered a victim and should seek therapy immediately.

Parents of non-complainants recall "a tremendous amount of [social] pressure for children to join the case." [Richard Tilker Aff. ¶ 10, A-787.] When a child denied abuse, their parents were told that the child was "in denial." [*See Capturing the Friedmans* Tr. 38–39, A-318–19; Richard Tilker Aff. ¶¶ 9–10, A-786–87; Brian Tilker Aff. ¶ 10, A-791; Forrest Aff. ¶ 5, A-798.] Great Neck had defined itself as a "victimized community," and those who refused to define themselves as victims no longer "fit in[.]" [*Capturing the Friedmans* Tr. 38, A-318.]

Local newspapers published numerous stories with detailed allegations from the case and extensively covered the community's outreach programs. The P.T.A. organized car-pools to transport community members to court appearances. Despite the highly explosive nature of the charges, accompanied by what Judge Abbey Boklan, the presiding judge, described as a "media

7

frenzy" [Jarecki Aff. ¶ 9 (quoting "DVD Extra Material," *Capturing the Friedmans*), A-429], Judge Boklan permitted the case to become the first in Nassau County in which cameras were allowed in the courtroom. As Judge Boklan explained, "It was something the community was very interested in, the media was very interested in . . . . I wasn't that concerned about protecting the defendants. Their pictures[,] their names were all over the newspapers, so their reputation [sic] at that point was [sic] not too good."[Jarecki Aff. ¶ 9 (quoting "DVD Extra Material," *Capturing the Friedmans*), A-429.] Notwithstanding the atmosphere she described, Judge Boklan denied petitioner's application for a change of venue.

On March 25, 1988, Arnold Friedman pled guilty to forty-two counts of child sexual abuse, at least in part because he believed petitioner would have a better chance at a fair trial that way. Nevertheless, the plea had the opposite effect. Specifically, after Arnold Friedman pled guilty, he was compelled to give the police a "close-out" statement in which he was asked to confirm that he had molested each child on a list of students. He was told that he would be granted immunity if he confessed to misconduct, but that any child he declined to admit molesting could be the source of further charges against him. In response, Arnold Friedman admitted to molesting each child on the list. Detectives proceeded to share the close-out statement with families of non-complainants to elicit further accusations against petitioner and to discourage former students from publicly supporting petitioner or agreeing to testify on his behalf. Moreover, on June 24, 1988, *Newsday*, the newspaper with the largest circulation in Nassau County, published a story that disclosed that Arnold Friedman "identified about 80 [additional] boys he had sexually abused" in the close-out statement. [*See* Pet'r Aff. ¶ 29, A-157.]

**B. Petitioner's Guilty Plea & Sentencing**

8

Petitioner—who was then only nineteen years old—alleges that he faced enormous pressure to plead guilty. The motion he made for a change of venue had been denied. The leak described above significantly added to the already hostile atmosphere that made a fair trial impossible. The Nassau County District Attorney's office did everything it could to force petitioner to plead guilty. After the second indictment, for example, Assistant District Attorney Onorato advised petitioner's attorney, Panaro, that if petitioner refused to plead guilty his office would obtain a third indictment which would include "many more charges than both previous indictments combined, and those charges would be much more serious." [Panaro Aff. ¶ 5, A-762.] When petitioner declined to plead guilty, Onorato followed through with his threat. Petitioner was also aware that investigations were brewing against his two brothers and many of his high school friends, a threat which he took seriously in light of the growing magnitude of allegations.

Morever, Judge Boklan acknowledged that "[t]here was never a doubt in [her] mind" as to petitioner's guilt. [*Capturing the Friedmans* Tr. 33, A-313], and even before she had heard any of the evidence she expressly informed Panaro that, if petitioner went to trial, she intended to sentence him consecutively on every count. Petitioner had until then strenuously resisted the efforts to coerce a plea and vehemently maintained his innocence. Panaro had also been convinced that petitioner was innocent:

> I already found it quite incredible that sexual abuse of that scope and severity alleged could have taken place without a single child complaining or showing other signs of abuse. I also believed that the hysteria surrounding the case could well be responsible for the ever growing number of charges . . . . My common sense and logic told me that scores of children, including the 14 children who were complainants against [petitioner], could not be repeatedly sodomized and sexually abused hundreds of times, over a period of four years, day in and day out, and say nothing. After all these were not 3 and 4 year old boys. They were between 8 and 11 years old. I felt that the idea that no one would have said a word, and that in fact some of the most significant

9

complainants would sign up for multiple classes after having been violently abused in the prior classes, was ridiculous.

[Panaro Aff. ¶ 19, A-766–67.]

Nevertheless, after Judge Boklan's threat, petitioner told Panaro that he wanted to plead guilty "because he believed that if he went to trial he would be found guilty and would spend almost the remainder of his life in jail." [Panaro Aff. ¶ 12, A-764.] Panaro told him that he "would not represent him on a guilty plea unless he was guilty and that [Panaro] could not ethically allow [petitioner] to plead guilty if he was maintaining his innocence to [Panaro]." [Panaro Aff. ¶ 12, A-764.] In response to Panaro's erroneous insistence on an admission of guilt,[1] petitioner told Panaro that he had committed the charged offenses, that he had been a victim of sexual abuse by his father, and that his father had coerced him into molesting students.

On December 20, 1988, petitioner pled guilty to Sodomy in the First Degree (seventeen counts), Use of a Child in a Sexual Performance (one count), Sexual Abuse in the First Degree (four counts), Attempting Sexual Abuse in the First Degree (one count), and Endangering the Welfare of a Minor (two counts), in full satisfaction of the three indictments filed against him. The minutes of

---

[1] Both the Supreme Court and the New York Court of Appeals have held that a defendant may plead guilty without explicitly admitting his guilt provided that it is a knowing and voluntary plea. *See North Carolina v. Alford*, 400 U.S. 25, 37–38 (1970); *People v. Serrano*, 15 N.Y.2d 304, 310 (1965). "Thus a conviction based on [such] a plea of guilty simply reflects the fact that for some reason, sufficient to the defendant, he decided to waive his trial rights." *People v. Grant*, 45 N.Y.2d 366, 379 (1978). Panaro's insistence on an admission of guilt as a condition to agreeing to representing him in the guilty plea is difficult to reconcile with these cases.

the plea are not available.[2] Judge Boklan sentenced petitioner to multiple concurrent terms, the longest of which was six to eighteen years. Petitioner did not appeal.

A few weeks after petitioner pled guilty, he gave a televised interview to Geraldo Rivera in which he repeated his confession and the story that his father had sexually abused him. Petitioner explains that he confessed to Panaro only so that Panaro would permit him to plead guilty, and that he submitted to the television interview "in what [he] believed to be a last-ditch effort to obtain public sympathy and explain [him]self in some way." [Pet'r Aff. ¶ 40, A-161–62.] Specifically, he made up the story about his father molesting him as a child because he believed it might insulate him from attacks in prison and might persuade Judge Boklan to ask the parole board for leniency on his behalf.

While in prison, petitioner was denied parole four times apparently because he refused to reiterate his guilt during a sex-offense therapy treatment program, as would have been required to successfully complete the program. *See* Susan Bandes, *The Lessons of* Capturing the Friedmans*: Moral Panic, Institutional Denial and Due Process*, 3 Law Culture & Human. 293, 304–05 (2007). After serving thirteen years in prison, petitioner was ultimately paroled on December 7, 2001. Judge Boklan held a sex offender registration classification hearing on January 7, 2002, in which she classified petitioner a level III "violent sexual predator" under the Sex Offender Registration Act (New York Correction Law article 6-C).

---

[2] Because petitioner did not take a direct appeal, the transcript of the plea of guilty was never prepared. Petitioner alleges that he and his attorneys made "exhaustive efforts to obtain those transcripts subsequent to his release from prison but have been repeatedly told that the transcripts are unavailable because the stenographer is no longer employed by Nassau County and did not leave behind [stenographic] notes from [petitioner's] guilty plea proceedings." [Pet'r Supplemental Br. at 13 n.6.]

## C. Post-Conviction Proceedings

In 2000, documentary filmmaker Andrew Jarecki began a three-year investigation of Arnold Friedman and petitioner's story for his film, *Capturing the Friedmans*. Jarecki interviewed many individuals who were involved with the original criminal investigation of Arnold Friedman and petitioner, including former computer students, detectives, attorneys, and family members. Petitioner first viewed the completed film on January 10, 2003. The film's producers permitted petitioner to view the underlying documents and footage from the film in July 2003.

Through the film, petitioner claims to have discovered a large volume of information he had never seen before regarding tactics used by detectives and therapists to obtain accusations of abuse from some of the complainants. The film also depicted an anonymous student, described as the source of thirty-five sodomy counts, claiming he was subjected to hypnosis prior to recalling abuse. According to the anonymous student, whom the third indictment referred to as "Gregory Doe" [*see* Indictment 69783, A-96–103], he did not recall any sexual abuse until after he went through hypnosis: "I just remember that I went through hypnosis, came out, and it was in my mind" [Gregory Doe Tr. 28, A-692]. This former student's therapist, however, claims that "[a]t no time during this patient's treatment did [she] ever use hypnosis" [Parks Aff. ¶ 4, A-867], and Assistant District Attorney Onorato claims that he was unaware of any specific treatment undergone by any complainant. Petitioner argues that other evidence suggests hypnosis was used more broadly.

On January 7, 2004, petitioner filed a post-judgment motion in the County Court, Nassau County, seeking to vacate the December 20, 1988 judgment based on evidence he first discovered after watching *Capturing the Friedmans* on January 10, 2003. Petitioner argued that, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), he was entitled to the disclosure of the newly discovered

information prior to the entry of his guilty plea. Relying on *United States v. Ruiz*, 536 U.S. 622 (2002), the Nassau County Court denied the petitioner's motion. On March 10, 2006, the Appellate Division denied petitioner's application for leave to appeal, at which point petitioner had exhausted his state remedies.

On June 23, 2006, petitioner filed a petition for a writ of habeas corpus in the Eastern District of New York. Petitioner argued that the film *Capturing the Friedmans* brought to light new evidence that (1) some eyewitnesses had initially denied sexual abuse, (2) detectives used interrogation methods known for eliciting false accusations, and (3) at least one suggestive memory recovery tactic—hypnosis—was used to induce memory recall by Gregory Doe before he made an accusation. Petitioner alleged that he would not have pled guilty if he had been aware of this undisclosed evidence.

On July 20, 2007, the district judge dismissed petitioner's first and second claims as untimely but reserved decision on the third claim. On January 4, 2008, the district judge held that petitioner's third claim, which alleged that the prosecution failed to disclose the use of hypnosis on at least one accuser, was untimely. The district judge subsequently granted a certificate of appealability.

**DISCUSSION**

**I.**

The only claim petitioner presses on appeal is the *Brady* claim that the prosecution should have disclosed the use of hypnosis to induce complainants to recall instances of sexual abuse. We conclude that this claim is untimely. Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), a defendant has one year from the date his conviction becomes final to file a petition for habeas relief. Nevertheless, AEDPA provides

13

several exceptions. *Wims v. United States*, 225 F.3d 186, 190 (2d Cir. 2000). One such exception restarts the statute of limitations period from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D).

Petitioner invokes this factual predicate exception. Specifically, he alleges that he did not become aware of the relevant evidence until he viewed the film *Capturing the Friedmans* on January 10, 2003. Nevertheless, petitioner's *Brady* claim was untimely because, although he knew, or should have known through the exercise of due diligence, that the prosecution may have withheld the relevant information when or soon after he viewed the film on January 10, 2003, he failed to file a habeas petition within one year of that date. Instead, on January 7, 2004, three hundred and sixty-two days after petitioner first viewed *Capturing the Friedmans*, he filed a post-judgment motion to vacate his conviction. This ultimately unsuccessful effort to obtain relief ended on March 10, 2006, when the Appellate Division denied his application for leave to appeal. Petitioner then had three days remaining within the statutory period to file a writ of habeas corpus. Petitioner did not file the petition until June 23, 2006, more than three months late.[3]

A claim of actual innocence could provide a basis for excusing this late filing even though petitioner pled guilty. *See Doe v. Menefee*, 391 F.3d 147, 161 (2d Cir. 2004). While petitioner did not expressly raise such a claim, he argues that the allegations contained in the petition, along with

---

[3] On January 18, 2006, petitioner submitted an application for leave to appeal to the New York Court of Appeals, but the application was unauthorized under N.Y. Criminal Procedure Law §§ 450.10 & 450.15 and was dismissed on May 24, 2006, *see People v. Friedman*, 6 N.Y.3d 894 (2002). An effort to exhaust state remedies by procedures that are not authorized by state law does not toll the one-year statute of limitations. *See Artuz v. Bennett*, 531 U.S. 4, 9 (2000); *see also Geraci v. Senkowski*, 211 F.3d 6, 9 (2d Cir. 2000).

14

evidence submitted in support of those allegations, were sufficient to alert the district judge to consider actual innocence as a basis for excusing his untimely filed petition. We need not resolve the issue here, however, because we conclude that, even if the petition is deemed to be timely, petitioner's *Brady* claim fails on the merits.

Under AEDPA, to prevail on a petition for a writ of habeas corpus, a petitioner confined pursuant to a state court judgment must show that the court's "adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "[C]learly established Federal law" refers to holdings of the Supreme Court, as opposed to dicta, as of the time of relevant state court decisions. *Carey v. Musladin*, 549 U.S. 70, 74–75 (2006); *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A decision is "contrary to" federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. An "unreasonable application" occurs when a "state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the [petitioner's] case." *Id.* "Unreasonableness is determined by an 'objective' standard." *Gersten v. Senkowski*, 426 F.3d 588, 607 (2d Cir. 2005) (quoting *Williams*, 529 U.S. at 409). Moreover, the Supreme Court has held that "unreasonableness" should not be conflated with "clear error" because "[t]he gloss of clear error fails to give proper deference to state courts." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

In *United States v. Ruiz*, 536 U.S. 622 (2002), the Supreme Court reaffirmed its earlier holding that a defendant is entitled to information necessary to ensure that his plea is voluntary, and

that any related waiver of his rights are made 'knowing[ly], intelligent[ly], [and] with sufficient awareness of the relevant circumstances and likely consequences.'" *Id.* at 629 (quoting *Brady v. United States*, 397 U.S. 742, 748 (1970)) (alterations in original). Nevertheless, because "impeachment information is special in relation to the *fairness of a trial*, not in respect to whether a plea is *voluntary* ('knowing,' 'intelligent,' and 'sufficient[ly] aware')," *Ruiz*, 536 U.S. at 629 (emphasis in original), the Supreme Court held that the failure to disclose such information prior to a guilty plea does not violate the Due Process Clause. While the Supreme Court acknowledged that "the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be," it held that "the Constitution does not require the prosecutor to share all useful information with the defendant." *Id.*; *cf. Padilla v. Kentucky*, 130 S. Ct. 1473, 1480 (2010) (holding that because "deportation is an integral part . . . of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes," defense counsel must apprise a pleading defendant of that consequence (footnote omitted)).

Petitioner characterizes the use of hypnosis as "exculpatory" evidence, a type of material *Ruiz* did not explicitly address. We disagree. The fact that hypnosis may have been used to stimulate memory recall and potentially induce false memories of abuse is a circumstance that would fit comfortably under the general understanding of impeachment evidence—evidence that "is offered to 'discredit a witness . . . to reduce the effectiveness of [her] testimony by bringing forth evidence which explains why the jury should not put faith in [her] or [her] testimony.'" *Chiasson v. Zapata Gulf Marine Corp.*, 988 F.2d 513, 517 (5th Cir. 1993) (alterations in original). There are generally five types of evidence used for this purpose, one of which relates to the capacity of a witness to observe, remember, or recount events. 3 Christopher B. Mueller & Laird C. Kirkpatrick, Federal

Evidence § 6.75, at 504 (3d ed. 2007).

Even if hypnosis evidence comes within *Brady*'s broader definition of exculpatory evidence, the petition must still be denied. Before *Ruiz*, in proceedings to which the AEDPA standard of review did not apply, we held that "[t]he government's obligation [under *Brady*] is pertinent not only to an accused's preparation for trial but also to his determination of whether or not to plead guilty." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998).[4] Petitioner is correct that *Ruiz* did not expressly abrogate this holding as applied to all *Brady* material. Nevertheless, the Supreme Court has consistently treated exculpatory and impeachment evidence in the same way for the purpose of defining the obligation of a prosecutor to provide *Brady* material prior to trial, *see United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio v. United States*, 405 U.S. 150, 153–54 (1972), and the reasoning underlying *Ruiz* could support a similar ruling for a prosecutor's obligations prior to a guilty plea, *see* 6 W. LaFave, J. Israel, N. King, & O. Kerr, *Criminal Procedure* § 24.3(b), at 369 (3d ed. 2007).[5]

---

[4]    Some commentators argue that, because not all of the reasoning in *Ruiz* would "apply with equal force to disclosure of purely exculpatory information," it is "unclear whether *Ruiz* overrules all of the Second Circuit precedent in this area or whether the Second Circuit's recognition of a right to disclosure of purely exculpatory information prior to a guilty plea survives." Gordon Mehler, John Gleeson, & David C. James, Federal Criminal Practice: A Second Circuit Handbook, § 18-6, at 302 (10th ed. 2010). Specifically, they refer to the Supreme Court's observation that impeachment information provides limited help to defendants at the plea stage and a rule requiring disclosure prior to trial would potentially endanger government witnesses whose identities were disclosed prior to trial. *See id.* (citing *Ruiz*, 536 U.S. at 629–32.) "The same reasoning would not apply with equal force to disclosure of purely exculpatory information, since such information would presumably be of greater assistance to a defendant in deciding whether to plead guilty and would not necessarily create a danger to government witnesses." *Id.*

[5]    This reading of *Ruiz* finds support in its additional holding, "for most (though not all) of the reasons" given for its holding relating to impeachment evidence, rejecting the argument that the Constitution requires the pre-plea disclosure of information supporting any affirmative defense. *Ruiz*, 536 U.S. at 633.

We need not, however, address this issue here. It is enough to say that the holding of the Nassau County Court, consistent with prior holdings of the Appellate Division from which this case arises, *see, e.g.*, *People v. Day*, 541 N.Y.S.2d 463, 467 (2d Dep't 1989),[6] does not constitute an "unreasonable application" of Supreme Court precedent as 28 U.S.C. § 2254(d)(1) requires. *See, e.g.*, *Carey*, 549 U.S. at 77 ("No holding of this Court required the [state] Court of Appeal to apply the test of [prior holdings to the] conduct [relevant] here. Therefore, the state court's decision was not contrary to or an unreasonable application of clearly established federal law."); *see also Rodriguez v. Miller*, 537 F.3d 102, 106 (2d Cir. 2008). Indeed, in a pre-AEDPA habeas corpus case, decided prior to *Ruiz*, the Fifth Circuit held that a defendant's *Brady* claim was not cognizable on habeas review because the application of *Brady* to a guilty plea would, at best, constitute a "new rule—one that seeks to protect a defendant's own decision making regarding the costs and benefits of pleading and of going to trial." *Matthew v. Johnson*, 201 F.3d 353, 362 (5th Cir. 2000) (en banc). Thus, even if petitioner succeeds in establishing his actual innocence as a predicate to avoiding the time-bar, the petition would have to be denied.

## II.

While the law may require us to deny relief in this case, it does not compel us to do so without voicing some concern regarding the process by which the petitioner's conviction was obtained. The magnitude of the allegations against petitioner must be viewed in the context of the late-1980's and early-1990's, a period in which allegations of outrageously bizarre and often

---

[6]     Although the New York Court of Appeals has never addressed the issue of whether *Brady* material must be disclosed to a defendant prior to a guilty plea, various departments of the Appellate Division are split on this issue. *See* 7 N.Y. Prac., New York Pretrial Criminal Procedure § 11:15 n.12 (citing cases).

18

ritualistic child abuse spread like wildfire across the country and garnered world-wide media attention. *See, e.g.*, Susan Bandes, *The Lessons of* Capturing the Friedmans*: Moral Panic, Institutional Denial and Due Process*, 3 Law Culture & Human. 293, 294 (2007) (noting that the accusations against Arnold and Jesse Friedman arose at "a time at which concern about day care sexual abuse had reached a fever pitch both in the United States and abroad"). The media sensationalized these allegations, generating a national perception that sex rings were widespread and had infiltrated average communities. *See, e.g.*, Devil Worship: Exposing Satan's Underground, Geraldo Rivera (NBC television broadcast Oct. 28, 1988).

Vast moral panic fueled a series of highly-questionable child sex abuse prosecutions.[7] *See* Samuel P. Gross, *Exonerations in the United States 1989 through 2003*, 95 J. Crim. L. & Criminology 523, 539–40 (2005). *See generally* Dorothy Rabinowitz, No Crueler Tyrannies: Accusation, False Witness, and Other Terrors of Our Times (2003). By 1991, for example, 25 percent of prosecutors had handled at least one case involving satanic abuse. *See* Elizabeth F. Loftus & Deborah Davis, *Recovered Memories*, 2 Annu. Rev. Clin. Psychol. 469, 477 (2006). Although many of these cases included "fantastical accusations," such as those of satanic abuse—a strand of accusations which has been discredited entirely—others involved allegations of real and serious

---

[7] *See, e.g.*, *Commonwealth v. Amiraults*, Nos. 85-69, 85-70, 85-72, 85-75, 85-77, 85-80, 85-2653, 85-2654, 85-2657, 85-2659, 85-2662, 85-2668 (Mass. Super. Ct. Middlesex County 1985), 677 N.E.2d 654, 424 Mass. 618 (1997) ("Fells Acre case"); *State v. Jones*, 643 N.E.2d 547, 71 Ohio St. 2d 293 (1994); *State v. Michaels*, 625 A.2d 489 (N.J. Super. App. Div. 1993) ("Wee Care Nursery School case"); *State v. Kelly*, No. 91-CRS-4250-4363 (N.C. Super. Crim. Ct. Apr. 22, 1992) ("Little Rascals Day Care case"); *State v. Fijnje*, No. 89-43952 (Fla. Cir. Ct. Dade County May 4, 1991) ("Old Cutler Presbyterian case"); *People v. Buckey*, No. A-750900, A-753005 (Cal. Mun. Ct. L.A. County 1984), No. A-A750900 (Cal. Super. Ct. L.A. County 1990) ("McMartin Preschool case"); *State v. Fuster*, No. 84-19728 (Fla. Cir. Ct. Dade County Oct. 9, 1985) ("Country Walk Babysitting Service case"); *People v. Kniffen*, Nos. 33610, 33624, 33700 (Cal. Mun. Ct. Kern County), No. 24208 (Cal. Super. Ct. Kern County 1982) ("Bakersfield case").

crimes committed in an impossible manner. Bandes, *supra*, at 301. In the Fells Acre case, for example, Gerald Amiraults, a member of a family which owned the Fells Acre pre-school, allegedly "plunged a wide-blade butcher knife into the rectum of a 4-year-old boy, which he then had trouble removing." Dorothy Rabinowitz, *Martha Coakley's Convictions*, Wall St. J., Jan. 15, 2010, at A19. According to a child witness, a teacher in the school saw Amiraults with the knife, asked what he was doing, and then told him not to do it again. "On this testimony, Gerald was convicted of a rape which had, miraculously, left no mark or other injury." *Id.*

Overall, at least seventy-two individuals were convicted in nearly a dozen major child sex abuse and satanic ritual prosecutions between 1984 and 1995, although almost all the convictions have since been reversed. *See* Gross, *supra*, at 540 & n.40. Some defendants, fearing trial, pled guilty or "no contest" to impossible acts of ritualistic abuse, and in some cases they provided detailed confessions in exchange for immunity or generous plea bargains. *See* Debbie Nathan & Michael Snedeker, Satan's Silence: Ritual Abuse and the Making of a Modern American Witch Hunt 160–77 (1995)*.* Many have described these widespread prosecutions as a modern-day "witch hunt." *See generally, e.g.*, Richard Guilliatt, Talk of the Devil: Repressed Memories and the Ritual Abuse Witch-Hunt (1996); Nathan & Snedeker, *supra*; Elizabeth Loftus & Katherine Ketcham, The Myth of Repressed Memory: False Memories and Allegations of Sexual Abuse (1994); Richard A. Gardner, Sex Abuse Hysteria: Salem Witch Trials Revisited (1992).

These prosecutions were largely based on memories that alleged victims "recovered" through suggestive memory recovery tactics, including those petitioner claims were used in this case. Indeed, the dramatic increase in conspiratorial charges of child sexual abuse has been traced to a relatively small group of clinical psychologists who supported the psychoanalytic notion of "repressed

20

memories" and encouraged patients to employ extensive "memory recovery procedures" to "break through the barrier of repression and bring memories into conscious awareness." Loftus & Davis, *supra*, at 470–71, 483–86; *see also* Kamala London et al., *Disclosure of Child Sexual Abuse: What Does the Research Tell Us About the Ways Children Tell?*, 11 Psychol. Pub. Pol. & L. 194, 213 (2005). Popular memory recovery procedures included hypnosis, age regression, dream interpretation, guided abuse-related imagery, use of photographs to trigger memories, journaling, and interpretation of symptoms as implicit memories. Loftus & Davis, *supra*, at 483–84. These procedures and others commonly employed have great potential to induce false memories. *See id.* at 484. Hypnosis, for example, has been shown to produce bizarre and impossible memories, including memories of ritualistic satanic abuse, memories from early infancy, memories from past lives, and memories from the future. *Id.*; *see also Rock v. Arkansas*, 483 U.S. 44, 59–61 (1987); *Borawick v. Shay*, 68 F.3d 597, 603–04 (2d Cir. 1995). The prevailing view is that the vast majority of traumatic memories that are recovered through the use of suggestive recovery procedures are false, and that almost all—if not all—of the recovered memories of horrific abuse from the late-1980's and early-1990's were false. *See id.* at 477.

Moreover, many highly-publicized and large-scale investigations into alleged child abuse conspiracies were also accompanied by a variety of interviewing techniques designed to assist children in recalling abuse—techniques which an extensive body of research suggests can induce false reports. *See, e.g.*, Sena Garven et al., *More Than Suggestion: The Effect of Interviewing Techniques From the McMartin Preschool Case*, 83 J. Applied Psychol. 347, 347 (1998). Garven et al. describes a "package" of techniques that, although based on a different highly-publicized

21

1980's abuse case,[8] are remarkably similar to the techniques employed in petitioner's case. The package included (1) "Suggestive Questions," (2) "Other People" (telling the child that the interviewer has already received information from other people regarding the topics of the interview), (3) "Positive and Negative Consequences" (responding positively to accusations of abuse and negatively to denials of abuse), (4) "Asked-and-Answered" (re-asking a child a question he or she has already unambiguously answered), and (5) "Inviting Speculation."[9] *Id.* at 348–50.

Scholars have suggested that each interviewing technique can induce false reports on its own. For example, they cite research which indicates that children often change their answer when asked the same question more than once during an interview, either because they assume that the first answer was incorrect or because they would like to please the adult interviewer. *See* Thomas D. Lyon, *Applying Suggestibility Research to the Real World: The Case of Repeated Questions*, 65 Law & Contemp. Probs. 97, 106 (2002). But the techniques have their greatest impact in combination. Garven et al. examined the effect of the "package" of techniques described above on false allegations of wrongdoing compared with suggestive questioning alone. *See* Garven et al., *supra*, at 350. They found that children exposed to the package of techniques falsely alleged wrongdoing over three times as often (58 percent of the time, compared to 17 percent of the time). *Id.* at 354.

---

[8]    The techniques were based on those used in the McMartin Preschool case, *People v. Buckey*, No. A750900 (Cal. Super. Ct. 1990), in which seven teachers were accused of abusing several hundred children over a ten-year period. None of the teachers were actually convicted. The case, which took place in a Los Angeles suburb, began in 1983 and ran through 1990, and it remains one of the longest and most expensive trials in California history. *See* Garven et al., *supra*, at 347.

[9]    These interviewing techniques are consistent with the theory that child abuse victims tend to deny abuse at first but will eventually admit abuse if repeatedly questioned. This theory, known as child sexual abuse accommodation syndrome ("CSAAS"), is now highly controversial. *See* London et al., *supra*, at 195–96. Indeed, empirical support for the theory was largely based on children who claimed they had experienced ritualistic satanic abuse. *See id.* at 211–13.

This error rate of nearly 60 percent occurred after less than five minutes of exposure to the combined techniques. *Id.* Though the study examined children who were somewhat younger than the complainants in petitioner's case, *see id.* at 350, the results are instructive as to the general dangers of suggestive interviewing techniques.

Finally, once individuals "recovered" memories of abuse or otherwise labeled themselves victims of abuse, they were generally encouraged to participate in various activities on an individual and community level to reinforce and develop existing memories of abuse. Loftus & Davis, *supra*, at 483. There, proponents of recovered memories advised alleged victims to expand on existing memories through suggestive memory recovery procedures (both in and out of therapy), participation in survivor groups, and solicitation of consistent information from others, "all with significant potential both to bias construction of historical narratives and to lead to confabulation of false memories." *Id.* When allegations of abuse span an entire community, these activities can provide an outlet for community reinforcement—an outlet which can strengthen survivor identities and foster the collective growth of increasingly inaccurate memories. *See id.*

When viewed in its proper historical context, petitioner's case appears as merely one example of what was then a significant national trend. This was a "heater case"—the type of "high profile case" in which "tremendous emotion is generated by the public." Bandes, *supra*, at 310. In heater cases, the criminal process often fails:

> Emotions like fear, outrage, anger and disgust, in situations like these, are entirely human. The question is what the legal system can do to correct for the excesses to which they lead. The crux of the moral panic dynamic is that the legal system, in such cases, does not correct for them. It gets swept up in them instead.

*Id.* at 312. The record in this case suggests this is precisely the moral panic that swept up Nassau County law enforcement officers. Perhaps because they were certain of Arnold Friedman and

23

petitioner's guilt, they were unfazed by the lack of physical evidence, and they may have felt comfortable cutting corners in their investigation. After all, "[t]horoughness is a frequent casualty of such cases." *Id.* at 309. The actions of the prosecution are also troubling. In representing the sovereign, a prosecutor is a "servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer." *Berger v. United States*, 295 U.S. 78, 88 (1935). "[W]hile [a prosecutor] may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Id.* Thus, prosecutors have an obligation to curb police overzealousness. In this case, instead of acting to neutralize the moral panic, the prosecution allowed itself to get swept up in it.

Petitioner has come forward with substantial evidence that flawed interviewing techniques were used to produce a flood of allegations, which the then-District Attorney of Nassau County wrung into over two hundred claims of child sexual abuse against petitioner. Petitioner never had an opportunity to explore how the evidence against him was obtained. On the contrary, the police, prosecutors, and the judge did everything they could to coerce a guilty plea and avoid a trial. Thus, with the number of counts in the indictments and Judge Boklan's threat to impose the highest conceivable sentence for each charge, petitioner faced a virtually certain life sentence if he was convicted at trial. And the likelihood that any jury pool would be tainted seemed to ensure that petitioner would be convicted if he went to trial, regardless of his guilt or innocence. Nor could he have reasonably expected to receive a fair trial from Judge Boklan, the former head of the Nassau County District Attorney's Sex Crime Unit, who admitted that she never had any doubt of the defendant's guilt even before she heard any of the evidence or the means by which it was obtained.

24

Even if innocent, petitioner may well have pled guilty.

As such, this case is unlike other appeals which raise concerns about the quality of the evidence and the guilt of the defendant. In those appeals, we defer to the judgment of the jury after the defendant has received a fair trial. We take comfort in "[t]he established safeguards of the Anglo-American legal system [which] leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury." *Hoffa v. United States*, 385 U.S. 293, 311 (1966). In this case, the quality of the evidence was extraordinarily suspect and never subjected to vigorous cross-examination or the judgment of a properly instructed jury.

Judge Friendly observed in his seminal essay on habeas corpus that, "[a] remedy that produces no result in the overwhelming majority of cases, . . . an unjust one to the state in much of the exceedingly small minority, and a truly good one only rarely, would seem to need consideration with a view to caring for the unusual case of the innocent man without being burdened by so much dross in the process." *See* Henry J. Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgements*, 38 U. Chi. L. Rev. 142, 148 (1970) (footnote omitted). The Supreme Court has not finally resolved the issue of whether there is a federal Constitutional right to be released upon proof of actual innocence. As Chief Justice Roberts recently observed, "Whether such a federal right exists is an open question. We have struggled with it over the years, in some cases assuming, *arguendo*, that it exists while also noting the difficult questions such a right would pose and the high standard any claimant would have to meet." *District Attorney's Office v. Osborne*, 129 S. Ct. 2309, 2321 (2009) (citations omitted).

Nevertheless, even if we also assumed that such a federal right exists, and that petitioner

25

could meet the "high standard any claimant would have to meet" to obtain relief, we could not reach that issue here. This is so because petitioner has not exhausted that claim in the New York State courts even though the New York cases suggest that relief on this basis may be available pursuant to N.Y. Crim. P. § 441.10(1)(h). *See, e.g.*, *People v. Day*, 26 Misc. 3d 1205(A), 2009 WL 5191433, *13 (N.Y. County Ct. Dec. 31, 2009); *People v. Bermudez*, No. 8759/91, 2009 WL 3823270, *22 (N.Y. Sup. Ct. Nov. 9, 2009); *People v. Wheeler-Whichard*, 884 N.Y.S.2d 304, 313 (Sup. Ct. 2009); *People v. Bozella*, 25 Misc. 3d 1215(a), 2009 WL 3364575, *16 (N.Y. County Ct. Oct. 14, 2009); *People v. Cole*, 766 N.Y.S.2d 477, 484–85 (Sup. Ct. 2003). Considering the facts of the case and the circumstances that caused him to plead guilty, this case may be one in which the New York courts may be particularly sympathetic to a proceeding seeking such relief.

The focus on the impediment to legal relief, however, should not obscure the continuing ethical obligation of the District Attorney to seek justice. We refer here especially to New York Rules of Professional Conduct 3.8, Comment 6B, which explains that "[t]he prosecutor's duty to seek justice has traditionally been understood not only to require the prosecutor to take precautions to avoid convicting innocent individuals, but also to require the prosecutor to take reasonable remedial measures when it appears likely that an innocent person was wrongly convicted." N.Y. Rules Prof'l Conduct 3.8, cmt. 6B. In language particularly pertinent here, the Comment goes on to say:

[W]hen a prosecutor comes to know of new and material evidence creating a reasonable likelihood that a person was wrongly convicted, the prosecutor should examine the evidence and undertake such further inquiry or investigation as may be necessary to determine whether the conviction was wrongful. The scope of the inquiry will depend on the circumstances. In some cases, the prosecutor may recognize the need to reinvestigate the underlying case; in others, it may be appropriate to await development of the record in collateral proceedings initiated by the defendant. The nature of the inquiry or investigation should be such as to provide a "reasonable belief" . . . that the conviction should or should not be set aside.

*Id.*

The record here suggests "a reasonable likelihood" that Jesse Friedman was wrongfully convicted. The "new and material evidence" in this case is the post-conviction consensus within the social science community that suggestive memory recovery tactics can create false memories and that aggressive investigation techniques like those employed in petitioner's case can induce false reports. Indeed, it is not even clear from the record that Assistant District Attorney Onorato was aware of the suggestive questioning techniques that were used by the Nassau County police.[10] More importantly, the record does not speak to whether the then–District Attorney of Nassau County, whose principal role was administering and overseeing the activities of one of the largest such offices in the United States,[11] was aware of the techniques used by the Nassau County detectives,

---

[10]     Although there are conflicting affidavits relating to whether Assistant District Attorney Onorato was aware of the videotape made by the mother of Gary Meyers, a former computer student, which vividly illustrates the suggestive techniques that the Nassau County detectives employed to elicit accusations from Arnold Friedman's former students, Onorato filed an affidavit denying knowledge of the videotape or that petitioner's attorney informed him that "police officers were using inappropriate interviewing techniques." [Onorato Aff. ¶ 5–6, A-869.]

[11]     The population of Nassau County in the late 1980s was approximately 1.3 million—the same as it is today. *See* 1 Nassau County Community Health Assessment, 2010 Update, Demographic & Health Resource Data, at 4, *available at* http://www.nassaucountyny.gov/agencies/ Health/documents/VolumeOne-DemographicandHealthResourceDataCHA2010-2013withCover Page.pdf. The staff of the District Attorney's Office today exceeds 370. *See* Nassau County District Attorney, ADA Career Opportunities, *available at* http://www.nassaucountyny.gov/agencies/da/

27

who were not members of his staff.

Only a reinvestigation of the underlying case or the development of a complete record in a collateral proceeding can provide a basis for determining whether petitioner's conviction should be set aside. We hope that, even if she continues to oppose relief in collateral legal proceedings, the current Nassau County District Attorney, who was not responsible for the investigation and prosecution of Jesse Friedman, will undertake the kind of complete review of the underlying case suggested in the Comment to Rule 3.8.

**III.**

We add these brief words in response to Judge Raggi's concurring opinion. While she joins in the affirmance in the denial of the writ, she questions the need to "engage in a lengthy discussion of the facts and circumstances that Friedman asserts led to his conviction," and she expresses understandable concern that these facts and circumstances were not developed at an evidentiary hearing. ***Concurring* Op.,** *ante* **at 30.** Nevertheless, she agrees with us that "the facts alleged are disturbing and may well warrant further inquiry by a responsible prosecutor's office," although she "cannot predict whether the outcome of any such inquiry will be favorable to petitioner, whose conviction is based on a plea of guilty that he thereafter publicly confirmed." *Id.*

Notwithstanding her reluctance to join "in the remainder of the opinion" beyond the discussion necessary to resolve petitioner's *Brady* claim, it bears emphasizing that all three members of the panel are in agreement that this case "may well warrant further inquiry by a responsible

---

ada_career.html. While statistics relating to the size of the District Attorney's Office are not available for the period during which the events at issue took place, the fact that the population of Nassau County has remained stable, combined with a reduced crime rate and serious fiscal problems, if anything, suggests that the size of the office has not grown.

prosecutor's office." *Id.* We are likewise in agreement that it is not possible to "predict whether the outcome of any such inquiry will be favorable to petitioner." *Id.* Moreover, we too would have preferred if the facts and circumstances were developed at a hearing. Nevertheless, we could not order a hearing over the objection of the District Attorney, who declined to waive the defense of the statute of limitations and permit such a hearing to be held.

Under these circumstances, the purpose of our "lengthy discussion of the facts and circumstances that Friedman asserts led to his conviction," *id.*, is to make the case that a "further inquiry by a responsible prosecutor's office" is justified despite a guilty plea entered under circumstances which clearly suggest that it was not voluntary. Indeed, passing over all of the pressures described above that were brought to bear on petitioner, the threat Judge Boklan made to petitioner's counsel, Peter Panaro, that, "if Jesse were to go to trial, she intended to sentence him to consecutive terms of imprisonment for each count that he was convicted on" [Pet'r Aff. ¶ 26, A-156; Panaro Aff. ¶ 11, A-764] would be sufficient by itself to sustain a challenge to the plea if Panaro's affidavit is credited.[12] Moreover, petitioner offered a plausible explanation for his post-plea admission. Specifically, he made up a story attributing his conduct to the fact that he was molested by his father as a child in the hope that it might insulate him from attacks in prison and might persuade Judge Boklan to ask the parole board for leniency on his behalf.

---

[12] *See Gains v. Murray*, No. 03-CV-016A, 2008 WL 4890249, at *5 (W.D.N.Y. Nov. 12, 2008) (collecting and summarizing New York caselaw regarding the propriety of comparable judicial threats); *see, e.g.*, *People v. Stevens*, 748 N.Y.S.2d 589, 590–91 (1st Dep't 2002) (holding that a defendant is coerced in pleading guilty when a trial judge indicates that the defendant is likely to receive a much heavier sentence after trial); *cf. Fielding v. LeFevre*, 548 F.2d 1102, 1106 (2d Cir. 1977) ("[The trial judge's] alleged threat of a more severe sentence should [the defendant] go to trial[, i]f true, . . . would establish a *per se* violation of the defendant's Sixth Amendment right to a trial, and require resentencing before a different judge [for a defendant who went to trial].").

In sum, an appellate court faced with a record that raises serious issues as to the guilt of the defendant and the means by which his conviction was procured, yet unable to grant relief, is not obligated to become a silent accomplice to what may be an injustice.

**CONCLUSION**

The judgment of the district court is AFFIRMED.

REENA RAGGI, *Circuit Judge*, concurring in part:

I join only in so much of the court's opinion as holds (1) that petitioner's *Brady* claim is untimely and (2) that this court need not decide whether to excuse such untimeliness on actual innocence grounds because the *Brady* claim does not merit habeas corpus relief in any event. To reach these conclusions, the court need not engage in a lengthy discussion of the facts and circumstances that Friedman asserts led to his conviction, much less assume the truth of those facts or the misconduct of police officers, prosecutors, defense counsel, and the presiding state court judge before a hearing. Accordingly, I do not join in the remainder of the opinion. While the facts alleged are disturbing and may well warrant further inquiry by a responsible prosecutor's office, I cannot predict whether the outcome of any such inquiry will be favorable to petitioner, whose conviction is based on a plea of guilty that he thereafter publicly confirmed.