GEORGE M. GOULD *v.* COMMISSIONER
OF CORRECTION
(SC 18732)

RONALD TAYLOR *v.* COMMISSIONER
OF CORRECTION
(SC 18733)

Rogers, C. J., and Norcott, Palmer, Zarella, McLachlan, Eveleigh and Vertefeuille, Js.

Argued February 11—officially released July 19, 2011

*Michael E. O'Hare*, supervisory assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, *John Waddock*, senior assistant state's attorney, and *James G. Clark*, former senior assistant state's attorney, for the appellant (respondent in both cases).

*Joseph Visone* and *Peter Tsimbidaros*, for the appellees (petitioner in each case).

*Opinion*

EVELEIGH, J. In *Summerville* v. *Warden*, 229 Conn. 397, 421, 641 A.2d 1356 (1994), this court held that a

petitioner may seek a new trial pursuant to a writ of habeas corpus on the basis of a substantial claim of actual innocence unaccompanied by an antecedent showing of a constitutional violation that affected the fairness of the petitioner's criminal trial.[1] The necessity for delineating the requisite proof to prevail on such a "freestanding" claim of actual innocence did not arise, however, until this court's decision in *Miller* v. *Commissioner of Correction*, 242 Conn. 745, 700 A.2d 1108 (1997). The present case requires us to elaborate on the meaning of "actual innocence" under the test set forth in *Miller* v. *Commissioner of Correction*, supra, 791–92 (*Miller* test). Specifically, we must address whether credible recantations of testimony that was the sole evidence of guilt can constitute clear and convincing evidence of actual innocence, as required under that test.

The respondent, the commissioner of correction, appeals[2] from the judgments of the habeas court granting the petitions for writs of habeas corpus filed by the petitioners, George M. Gould and Ronald Taylor.[3] The respondent's dispositive claim is that the habeas court applied an improper standard when it granted habeas relief on the basis of recantations by two of the state's witnesses. We conclude that the trial court improperly failed to recognize that, under the *Miller* test, actual innocence requires affirmative evidence that the peti-

---

[1] As one court succinctly described such a "freestanding" claim: "Metaphorically, an actual innocence claim . . . seeks a second bite at the apple, but unlike an ineffective assistance of counsel claim, for example, it does not contend the first bite was rotten." *In re Lawley*, 42 Cal. 4th 1231, 1241, 179 P.3d 891, 74 Cal. Rptr. 3d 92 (2008).

[2] The respondent appealed from the habeas court's judgments granting the petitions to the Appellate Court. We thereafter transferred the appeals to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] For purposes of clarity, we refer herein to Gould and Taylor individually by name, and jointly as the petitioners, when necessary.

tioners did not commit the crimes of which they were convicted, not simply the discrediting of evidence on which the conviction rested. Accordingly, the habeas court's judgments granting the petitions must be reversed and the cases must be remanded for a new trial under the proper standard.

The record reveals the following undisputed facts and procedural history. On July 4, 1993, at 5:08 a.m., Eugenio Vega, the owner of La Casa Green, a retail store on Grand Avenue in the Fair Haven section of New Haven, entered the store and deactivated its alarm system. At 5:42 a.m., the police received a 911 call alerting them to suspicious activity at the store from Mary Boyd, a regular customer who became concerned when she could not locate Vega inside or outside of the open store. At 6:05 a.m., two officers from the New Haven police department arrived at the store. Upon entering and searching the premises, the officers went to the back of the store where they noticed an open safe and a wallet, lying in plain view, which contained no cash. Officer Keith Wortz opened the door to a nearby walk-in freezer and found Vega inside, slumped over in a semiseated position with his hands bound in front of him with an electrical extension cord. Vega had been fatally shot at close range by a single gunshot to his left temple.

In the following days, the police canvassed the neighborhood and obtained interviews from several people who had either seen Vega or been in the vicinity of the store between 5 and 6 a.m. on the morning of the shooting. The petitioners were among those who eventually were interviewed. In the course of those interviews, they admitted that they had gone out together to raise money to buy drugs in the vicinity of La Casa

Green, first at 11:30 p.m. on July 3, 1993, and later at approximately 3 a.m. on July 4, 1993.[4]

On July 29, 1993, the police obtained information connecting the petitioners to Vega's shooting. On that date, the police arrested Doreen Stiles in a prostitution sweep of the Fair Haven area. Because Stiles regularly worked in that area, the police questioned her about the shooting. After several hours of questioning, Stiles stated that she had been outside of the store, had heard someone threaten Vega and had seen two men, later identified as the petitioners, leave the store. The police reinterviewed Pam Youmans, who had been in the store with Vega just after he had opened it. Youmans then stated for the first time that she had seen a woman, later identified as Stiles, outside of La Casa Green that morning. The police also reinterviewed Boyd, who stated that, on the morning of the murder, she had seen

[4] As this court noted in the petitioners' direct criminal appeal: "Detective Leroy Dease of the New Haven police department testified that during his investigation in this case, he spoke with Gould several times. Gould told Dease that he had left Tasha Grumes' apartment with Taylor and Lawrence Kelly around 11:30 p.m. on July 3, 1993. Gould stated that they had been trying to raise money near Grumes' apartment in order to buy drugs, that they had raised money and bought drugs, and that they had also given $30 to Grumes. Gould further told Dease that he had been at 480 Ferry Street with Taylor and Kelly at 3 a.m. on July 4, 1993, and that they also had been successful at raising money and buying drugs at that location. Gould stated that he and Taylor had then been at Gerrilyn Herring's house until 6:15 a.m.

"Dease also had spoken with Taylor, who told Dease that he had been with Gould and Kelly that night. Taylor stated, however, that the incident at 480 Ferry Street had occurred at 11:30 p.m. and that the incident near Grumes' apartment had occurred in the early morning. Taylor further stated that Kelly had not been involved in the incident near Grumes' apartment. Taylor told Dease that he had gone to Herring's house at about 3 a.m. and left about 5:30 a.m." *State* v. *Gould*, 241 Conn. 1, 21, 695 A.2d 1022 (1997).

In the criminal appeals, this court rejected Taylor's claim that, even though the state was not permitted to refer to "robberies," the jury necessarily would construe the evidence of attempts to raise money at night as robberies. Id., 22. This court pointed to evidence that two other witnesses, Pam Youmans and Doreen Stiles, also were out on the street in the early morning hours of July 4, 1993, looking for money to buy drugs. Id.

two dark skinned men in the store, one shorter than the other, when looking from the outside of the store inside through the front window.[5]

The petitioners were arrested and charged with murder in violation of General Statutes § 53a-54a (a), felony murder in violation of General Statutes § 53a-54c, robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (2) and 53a-8, criminal attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (2), 53a-8 and 53a-49, and conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-134 (a) (2). At a joint trial before a jury, the state's theory was that the petitioners had robbed and killed Vega as part of a night long spree to obtain more drugs. The state's key witness was Stiles, who presented the only evidence directly connecting the petitioners to the crimes. Boyd and Youmans also testified about their observations, consistent with their latest statements to the police. In support of the robbery related charges, Susana Negron, Vega's daughter and the store's bookkeeper, testified that she had not made her usual weekly bank deposit for the store's cash receipts the week before her father was shot and that, several months earlier, she had seen jewelry, cash and coins in the safe. The petitioners did not testify. In their defense, they attempted to discredit Stiles, to call into question whether a robbery had occurred and to underscore the absence of any physical evidence linking them to the crimes.

The jury acquitted the petitioners of the murder charge but convicted them on all of the other counts. The trial court, *Fracasse, J.*, thereafter sentenced each petitioner to a total effective sentence of eighty years imprisonment. The petitioners directly appealed to this court, which affirmed the judgment, with the exception

---

[5] Both of the petitioners are dark skinned men.

of Taylor's conviction of attempt to commit robbery in the first degree.[6] *State* v. *Gould*, 241 Conn. 1, 695 A.2d 1022 (1997).

In October, 2003, the petitioners filed petitions for writs of habeas corpus. Following continuances to, inter alia, obtain DNA testing of the cord used to tie Vega's hands, in May, 2009, the petitioners filed the amended petitions at issue in the present appeals. In those petitions, they sought relief on the grounds of ineffective assistance of counsel and actual innocence.[7] The thrust of the allegations in support of these claims was: (1) there was evidence that was not produced at their criminal trial that would have cast doubt on whether a robbery actually had occurred, as well as evidence pointing to a motive and means for Vega's son, Carlos DeLeon Vega (DeLeon), to have committed the murder; (2) the DNA test exonerated the petitioners; and (3) both Stiles and Boyd had recanted their testimony.

The habeas court, *Fuger*, *J.*, rejected the ineffective assistance of counsel claim, but agreed with the petitioners that the evidence demonstrated their actual innocence. The court began its memorandum of decision with a discussion of the legal requirements for a claim of actual innocence. It concluded that it was

[6] This court agreed with Taylor's claim that his conviction of attempt to commit robbery in the first degree could not stand because it was a lesser included offense of robbery in the first degree. *State* v. *Gould*, 241 Conn. 1, 23–24, 695 A.2d 1022 (1997). This court remanded the case to the trial court with direction to merge the defendant's conviction of robbery in the first degree with his conviction of attempt to commit robbery in the first degree, and to vacate the sentence for attempt to commit robbery in the first degree. Id., 24. Gould did not challenge his conviction of attempt to commit robbery in the first degree.

[7] The petitions also included counts alleging that the trial court had impaired their rights to present a defense and to confront witnesses against them. The state argued in its posttrial brief that the petitioners already had litigated these issues in their criminal appeals. The petitioners did not address these issues in their posttrial brief, and the habeas court did not address them in its memorandum of decision.

bound by Appellate Court case law holding that the petition must be predicated on newly discovered evidence, but found that the recantations by Stiles and Boyd met this requirement.[8] It noted that the appellate courts had not yet addressed an actual innocence claim based "almost entirely, if not solely, on a recantation." The habeas court acknowledged that, although courts must view recantation evidence skeptically, such skepticism does not operate as a bar to relief when the recantation is found to be credible. In reaching that conclusion, the court relied on case law addressing petitions for a new trial. The habeas court nonetheless recognized that this court, in *Miller*, had determined that a more exacting standard must be applied to habeas claims of actual innocence, namely, proof that "no reasonable fact finder, considering all of the evidence in the same way that the habeas court considered it, and drawing the same inferences that the habeas court drew, would find the petitioner guilty of the crime of which he stands convicted." *Miller* v. *Commissioner of Correction*, supra, 242 Conn. 800.

With these requirements in mind, the habeas court turned to the evidence in the case before it. The court began by noting its agreement with the prosecutor's statement to the jury in closing argument in the petitioners' joint criminal trial: " '[T]his case rises and falls on the testimony of . . . Stiles.' " Because Stiles had

---

[8] Although the Appellate Court has determined that a claim of actual innocence must be supported by newly discovered evidence; see *Gaston* v. *Commissioner of Correction*, 125 Conn. App. 553, 558, 9 A.3d 397 (2010), cert. denied, 300 Conn. 908, 12 A.3d 1003 (2011); this court has not yet addressed that question. See *Mozell* v. *Commissioner of Correction*, 291 Conn. 62, 81 n.10, 967 A.2d 41 (2009) (noting that this issue has been open question for this court since our decision in *Miller* because every case has involved unchallenged finding that evidence was newly discovered). We also need not address this issue in the present case because the respondent does not challenge the habeas court's finding that the recantations are newly discovered evidence.

disavowed her criminal trial testimony at the habeas trial, the habeas court determined that Stiles had committed perjury at one of those trials. The court noted that, because Stiles' criminal trial testimony had been presented by way of videotape,[9] it was able to view that testimony in the same manner that the jury had, placing the court in a unique position to determine which testimony was more credible. Ultimately, it determined that Stiles' testimony at the habeas trial was more credible, and it reached a similar conclusion with respect to Boyd's less significant recantation.[10]

The habeas court first set forth the following account of the events of July, 4, 1993, that Stiles originally had offered at the criminal trial. Stiles left her home at approximately 4 a.m. and arrived at the intersection of Grand Avenue and Ferry Street at approximately 4:35 a.m. Fifteen minutes later, after walking down Grand Avenue toward La Casa Green, she was one block away from the store when she saw a menacing looking black male walking toward the store. Because the man's demeanor frightened her, Stiles walked as quickly as she could to an alley at the side of the store and hid there, close to the building. Stiles heard arguing coming from three distinct voices in the store, one of which she recognized as Vega's. Although many of the words were muffled, she distinctly heard two angry voices saying something about money and opening the safe, and Vega's screaming response in Spanish. After a couple of minutes, she heard a single gunshot. Stiles initially

[9] Stiles was hospitalized with endocarditis, a potentially life threatening heart condition, at the time of the petitioners' criminal trial.

[10] In a footnote, the habeas court noted: "Of course . . . Stiles is not the only witness to have changed her testimony. . . . Boyd, who in 1993 had a drug habit, is now also drug free and admits to lying to the police to avoid prosecution and prevent [the department of children and families] from taking her children. Her recantation and habeas testimony in 2009 is deemed credible. Less space is devoted to an analysis of her recantation because she is a less central figure than . . . Stiles."

froze out of fear, but then left the alley as quickly as she could. She saw two black men exit the store, look around, cross the street and head back in the direction from which the menacing looking man had come. Although the men did not see Stiles, they glanced in her general direction, allowing her to see their faces for one or two seconds. Stiles had identified the man she first saw outside the store as Gould, and the other man leaving the store with him as Taylor.

The habeas court then contrasted Stiles' criminal trial testimony with the following account that she had offered in her habeas testimony. At approximately 4:30 a.m. on July 4, Stiles arrived at the Dunkin' Donuts on the corner of Ferry Street and Grand Avenue to get some coffee before walking the streets to solicit money for sex to support her heroin habit. Stiles finished her coffee, walked up Ferry Street to Chatham Street, and solicited money for sex from one client at approximately 5 a.m. Thereafter, Stiles walked up and down Ferry Street looking for other clients. Stiles admitted that, contrary to her criminal trial testimony, she never had been in the vicinity of La Casa Green on the morning of July 4, 1993.

The habeas court noted the following factors that demonstrated the credibility of Stiles' account at the habeas trial. Although the statute of limitations to prosecute Stiles for perjuring herself at the criminal trial had passed, she had exposed herself to the risk of prosecution if she had perjured herself at the habeas trial. In terms of demeanor, Stiles had appeared drawn, haggard and hostile during her criminal trial testimony, whereas she appeared healthy and nonevasive at the habeas trial. In addition, the timelines provided by Stiles and Boyd in their original testimony were inconsistent with Stiles' testimony that she had seen the petitioners flee the crime scene. The timeline offered in the criminal trial would have had Stiles arrive at La Casa Green before

Vega even had deactivated the alarm, and a different timeline that Stiles had provided at the probable cause hearing would have had her arrive while Boyd was coming in and out of the store looking for Vega, even though Boyd never had seen Stiles there.

The habeas court also considered the following explanation offered by Stiles as to why she had lied at the criminal trial. After the police arrested Stiles on July 29, 1993, they pressed her to tell them what she knew about the shooting. Stiles repeatedly denied having any knowledge but, several hours later, after feeling "dopesick" and wanting to go home, she felt pressured to tell the police what she thought they wanted to hear. Stiles picked up on what she perceived as nonverbal clues by the interrogating officers as to correct answers, picked the petitioners' photographs from a photographic array and eventually gave a statement inculpating the petitioners. During the interview, one of the officers promised to help her get some heroin if she helped them. After she did so, they gave her $60 and drove her to a location where she used that money to purchase heroin. On the night before the probable cause hearing, some New Haven police officers put her up in a hotel and helped her obtain more heroin. The habeas court noted that the testimony of several New Haven police detectives had confirmed much of Stiles' account, except they had denied providing money to Stiles for drugs. Ultimately, the habeas court concluded that Stiles had lied because, at the time of the criminal trial, she was a deeply troubled woman supporting a ten bag a day heroin addiction by engaging in prostitution.

Finally, the habeas court identified the following weaknesses in the state's case. First, there were facts that raised questions regarding the robbery motive for Vega's killing: the perpetrator had not taken money from obvious sources, namely, a cash register keyed open and a large wad of dollar bills in Vega's front

pocket; the evidence was "sketchy at best" that any jewelry had been in the safe; and there was no sign of any struggle.[11] Second, there was no physical evidence linking the petitioners to the crime, and no gun or money had been found in the petitioners' possession. Third, the petitioners presented credible evidence that "seemingly implicates [Vega's] son [DeLeon] as a possible perpetrator of this crime." That evidence suggested that DeLeon could have had a motive to commit the crime—he may have embezzled money from his father—and the means to commit it—he was the record owner of a gun that was capable of producing the marks found on the projectile recovered at the crime scene, although that gun never was located for testing. The habeas court also noted, however, that there was no physical evidence linking DeLeon to the scene. Indeed, the DNA tests on the sample of the cord used to tie Vega's hands "exonerated" both DeLeon and the petitioners.[12]

---

[11] In the petitioners' direct criminal appeals, Taylor had claimed that his convictions of felony murder, robbery in the first degree and attempt to commit robbery in the first degree should be reversed because there was no evidence that either a robbery or an attempted robbery had been committed at La Casa Green. *State* v. *Gould*, supra, 241 Conn. 5. Taylor asserted that the state had not established what items had been in the safe, or that anything was missing from the safe, and that there was no evidence that anything was missing from Vega's person. Id., 5–6. This court rejected that claim. See id., 7–8 (setting forth evidence supporting these convictions).

[12] The state suggests in its brief to this court that the DNA test was of no evidentiary value because it also did not reveal any DNA from Vega. The petitioners point out that the DNA test did reveal female DNA. Their theory at the habeas trial was that Youmans, who had been with Vega when he opened the store, was still there when DeLeon came into the store and shot Vega. Two audiotaped interviews conducted in 2009 between Youmans and the petitioners' investigator were introduced into evidence. The first interview was consistent with Youmans' testimony at the criminal trial that she had left the store when Vega was still alive and knew nothing about the shooting. The second interview provided some support for the petitioners' theory. The habeas court did not mention either taped interview in its memorandum of decision and made no express finding regarding Youmans' criminal trial testimony.

Ultimately, the habeas court concluded: "[T]he evidence of a murder having taken place is clear. What is not proven is that it was [the petitioners] who committed this crime. There was no fingerprint evidence, there was no murder weapon recovered, there were no 'fruits of the crime' recovered and there was no DNA evidence at the crime scene that in any way linked the petitioners to this crime. . . . [Stiles'] statement is the keystone of the evidence upon which these convictions rest.

"Moreover, upon closer examination of the criminal trial testimony of [Stiles and Boyd], now considered in the light of the recanted testimonies of both women, it can clearly be seen that the story told by . . . Stiles [at the probable cause hearing and at the criminal trial] in 1993 [and] 1995 simply cannot be true."

Applying these facts to the claims raised in the petition, the habeas court concluded that the petitioners had established their entitlement to relief on the basis of actual innocence. The court reasoned: "In short, the finding that . . . Stiles was not telling the truth in 1993 [and] 1995 not only renders the ultimate conviction unreliable, it *wholly vitiates all* of the proceedings against [the petitioners]. These cases, in fact, go way beyond 'actual innocence.' The criminal cases never should have been initiated in the first place! These men deserve *immediate* relief." (Emphasis in original.) Accordingly, the habeas court granted the petitions, vacated the convictions and ordered the respondent to immediately and unconditionally release the petitioners.[13] The respondent's appeals followed. See footnote 2 of this opinion.

The respondent claims that the habeas court improperly: (1) failed to apply the *Miller* test and found that

---

[13] The habeas court later amended its order to provide that the petitioners were to be released subject to specified conditions, including posting a $100,000 nonsurety bond and being subject to electronic monitoring, until the appeals were concluded.

the petitioners had proven actual innocence in the absence of affirmative evidence that the petitioners did not commit the crimes of which they were convicted; (2) found Stiles' recantation credible; and (3) exceeded its authority even if the petitioners were entitled to habeas relief by ordering their immediate and unconditional release instead of a new trial. In response, the petitioners contend that the habeas court applied the proper standard and that overwhelming evidence, including third party culpability evidence, supports that court's findings that the recantations of Stiles and Boyd were credible. The petitioners further contend that the habeas court had discretion to order their release. We agree with the respondent's first claim. Because this conclusion requires us to reverse the judgments and remand the cases for a new trial consistent with the proper application of the *Miller* test, we need not consider the respondent's second and third claims.

The question of whether the habeas court applied the correct standard is a question of law subject to plenary review. Cf. *In re Tayler F.*, 296 Conn. 524, 537, 995 A.2d 611 (2010) (applying plenary review to question of whether trial court applied proper standard and procedures in making discretionary determination); *Smith* v. *Muellner*, 283 Conn. 510, 536, 932 A.2d 382 (2007) (whether correct burden of proof was applied is question of law subject to plenary review). With respect to the correct standard, *Miller* unequivocally and unmistakably set forth a two part test for obtaining habeas relief on the basis of a freestanding claim of actual innocence. In that opinion, this court twice stated that standard as follows: "First, taking into account both the evidence produced in the original criminal trial and the evidence produced in the habeas hearing, the petitioner must persuade the habeas court by clear and convincing evidence, as that standard is properly understood and applied in the context of such a claim, that

the petitioner is actually innocent of the crime of which he stands convicted. Second, the petitioner must establish that, after considering all of that evidence and the inferences drawn therefrom, as the habeas court did, no reasonable fact finder would find the petitioner guilty." *Miller* v. *Commissioner of Correction*, supra, 242 Conn. 791–92; id., 747.

In the present case, it is difficult to ascertain whether the habeas court recognized that it was required to apply this test. The habeas court mentioned the second prong of the *Miller* test seventeen pages into its discussion of the proper legal standard for a claim of actual innocence. Nowhere in that discussion did it mention the first prong of the test. This omission is curious given not only our succinct statement of the test, but also the scores of appellate decisions that have set forth this test verbatim. See, e.g., *Mozell* v. *Commissioner of Correction*, 291 Conn. 62, 80–81, 967 A.2d 41 (2009); *Lewis* v. *Commissioner of Correction*, 116 Conn. App. 400, 415, 975 A.2d 740, cert. denied, 294 Conn. 908, 982 A.2d 1082 (2009); *Weinberg* v. *Commissioner of Correction*, 112 Conn. App. 100, 118, 962 A.2d 155, cert. denied, 291 Conn. 904, 967 A.2d 1221 (2009); *Wilson* v. *Commissioner of Correction*, 104 Conn. App. 224, 246, 932 A.2d 481 (2007).

Nonetheless, the habeas court did incorporate the language of the first prong when rejecting the petitioners' ineffective assistance of counsel claim fifty-three pages into its decision: "Despite the fact that this habeas court is convinced with clear and convincing evidence that the petitioners are actually innocent of the charges in this case and will grant relief on that basis, the court does not find that the trial defense counsel were ineffective." This reference, in conjunction with the earlier references to the *Miller* decision, persuades us that the habeas court was aware of the *Miller* test. The question

therefore becomes whether it actually applied the standard that *Miller* intended.

The respondent conceded at oral argument before this court that, if Stiles' recantation properly can be credited, the second prong of the *Miller* test undoubtedly would be satisfied, given that no reasonable juror who believed her recantation would find the petitioners guilty. We therefore focus our attention on the first prong of the *Miller* test. Put another way, this appeal essentially raises the question of whether satisfaction of the second prong of the *Miller* test necessarily dictates that the first prong of that test has been met. We conclude that it does not.[14]

When this court first recognized actual innocence as a basis for habeas relief, we reasoned that only an extraordinary circumstance could justify such relief because: (1) the petitioner would have been convicted in a trial that was free of any antecedent constitutional defect; and (2) the legislature had determined that petitions for a new trial on the basis of newly discovered evidence generally can only be brought within three years of the rendition of judgment; General Statutes §§ 52-270 (a) and 52-582;[15] whereas habeas relief can

[14] We note that the recantation evidence in the present case is of an entirely different character than the third party confession at issue in *Miller*—the former directly discredits the state's evidence, whereas the latter provides a wholly different account than the state's evidence. As a result, the present case gives us occasion to examine the *Miller* test through a slightly different lens. That examination suggests to us that there may not be any case in which the first prong is not dispositive of the petition, either because the failure to satisfy the first prong will be fatal or because satisfaction of the first prong necessarily will satisfy the second prong in light of reexamination of the same evidence and reliance on the same inferences. Indeed, as the discussion in this opinion demonstrates, the first prong of *Miller* sets forth the heart of an actual innocence claim. Nonetheless, neither party in the present case has asked this court to reconsider the *Miller* test. Therefore, should it be necessary, we leave to another day the question of whether some modification to the test should be considered.

[15] There is no time limit for seeking a new trial predicated on DNA evidence. General Statutes § 52-582.

be sought even decades later. *Summerville* v. *Warden*, supra, 229 Conn. 424–31. When later required to prescribe the requisite proof to prevail on such a claim, much of this court's analysis in *Miller* was dedicated to the question of how persuasive the evidence of actual innocence must be. In deciding that clear and convincing evidence was the proper burden of proof, this court explained that "the substantial greatness of the probability of the truth of the facts asserted indicates that it is a very demanding standard and should be understood as such, particularly when applied to a habeas claim of actual innocence, where the stakes are so important for both the petitioner and the state. We have stated that the clear and convincing evidence standard should operate as a weighty caution upon the minds of all judges, and it forbids relief whenever the evidence is loose, equivocal or contradictory." (Internal quotation marks omitted.) *Miller* v. *Commissioner of Correction*, supra, 242 Conn. 795. We equated the clear and convincing burden with an "extraordinarily high and truly persuasive [demonstration] of actual innocence"; (internal quotation marks omitted) id., 795; one in which the petitioner must "unquestionably establish [his] innocence." (Internal quotation marks omitted.) Id. This court underscored that "truly persuasive demonstrations of actual innocence after conviction in a fair trial have been, and are likely to remain, extremely rare." (Internal quotation marks omitted.) Id., 805–806. Indeed, *Miller* remains the only case in which a claim of actual innocence successfully has been established in this state.

Our use of the term "actual innocence" is of paramount significance. Actual innocence, also referred to as factual innocence; *Bousley* v. *United States*, 523 U.S. 614, 623, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998); is different than legal innocence. Actual innocence is not demonstrated merely by showing that there was insuffi-

cient evidence to prove guilt beyond a reasonable doubt. See *Ankerman* v. *Commissioner of Correction*, 122 Conn. App. 246, 252, 999 A.2d 789 (petitioner's claim that state failed to prove element of specific intent "is essentially one of sufficiency of the evidence and not one of actual innocence"), cert. denied, 298 Conn. 922, 4 A.3d 1225 (2010); *People* v. *Barnslater*, 373 Ill. App. 3d 512, 520, 869 N.E.2d 293 ("actual innocence [does] not concern whether a defendant had been proved guilty beyond a reasonable doubt" [internal quotation marks omitted]), appeal denied, 225 Ill. 2d 641, 875 N.E.2d 1115 (2007); *Ex parte Franklin*, 72 S.W.3d 671, 678 (Tex. Crim. App. 2002) (petitioner asserting freestanding actual innocence "must establish his innocence of the crime by clear and convincing evidence and not merely that he would be found not guilty by a subsequent jury").

Rather, actual innocence is demonstrated by affirmative proof that the petitioner did not commit the crime. See *Carriger* v. *Stewart*, 132 F.3d 463, 476–77 (9th Cir. 1997) ("Requiring affirmative proof of innocence is appropriate, because when a petitioner makes a freestanding claim of innocence, he is claiming that he is entitled to relief despite a constitutionally valid conviction. . . . Although the postconviction evidence [the petitioner] presents casts a vast shadow of doubt over the reliability of his conviction, nearly all of it serves only to undercut the evidence presented at trial, not affirmatively to prove [his] innocence. [The petitioner] has presented no evidence, for example, demonstrating he was elsewhere at the time of the murder, nor is there any new and reliable physical evidence, such as DNA, that would preclude any possibility of [his] guilt." [Citations omitted.]), cert. denied, 523 U.S. 1133, 118 S. Ct. 1827, 140 L. Ed. 2d 963 (1998); *People* v. *Barnslater*, supra, 373 Ill. App. 3d 520 ("actual innocence mean[s] total vindication, or exoneration" [internal quotation

marks omitted]); *Beach* v. *State*, 353 Mont. 411, 421, 220 P.3d 667 (2009) ("[a] petitioner predicates a substantive 'actual innocence' claim on the assertion that he did not commit the crime of which he has been convicted"); *Ex parte Franklin*, supra, 72 S.W.3d 677 ("clear and convincing evidence that no reasonable juror would have convicted [the petitioner] in light of the newly discovered evidence . . . requires . . . evidence that goes towards affirmatively proving [the petitioner's] innocence"); see also *Turner* v. *Commonwealth*, 56 Va. App. 391, 411, 694 S.E.2d 251 (2010) (explaining that relief on petition for "a writ of actual innocence" is available "only to those individuals who can establish that they did not, as a matter of fact, commit the crime for which they were convicted and not to those who merely produce evidence contrary to the evidence presented at their criminal trial" [internal quotation marks omitted]), appeal granted, Docket No. 101457, 2011 Va. LEXIS 9 (Va. January 7, 2011). Indeed, the petitioners have brought no case to our attention in which any other jurisdiction has granted habeas relief on a freestanding claim of actual innocence in the absence of such affirmative evidence, and our independent research of scores of cases reveals none.[16]

---

[16] California, Illinois, Missouri, Montana, New Mexico, New York and Texas have recognized freestanding actual innocence claims as a basis for habeas relief. See *In re Bell*, 42 Cal. 4th 630, 637, 170 P.3d 153, 67 Cal. Rptr. 3d 781 (2007); *People* v. *Morgan*, 212 Ill. 2d 148, 154, 817 N.E.2d 524 (2004); *State ex rel. Amrine* v. *Roper*, 102 S.W.3d 541, 543 (Mo. 2003); *Beach* v. *State*, supra, 353 Mont. 421; *Montoya* v. *Ulibarri*, 142 N.M. 89, 91, 163 P.3d 476 (2007); *People* v. *Wheeler-Whichard*, 25 Misc. 3d 690, 702, 884 N.Y.S.2d 304 (Sup. 2009); *People* v. *Cole*, 1 Misc. 3d 531, 542, 765 N.Y.S.2d 477 (Sup. 2003); *Ex parte Franklin*, supra, 72 S.W.3d 677; see also *State* v. *Conway*, 816 So. 2d 290, 291 (La. 2002) (per curiam) (assuming, without deciding, that freestanding claim may be established). Other jurisdictions have statutes that provide postconviction relief on the basis of actual innocence. See, e.g., D.C. Code Ann. §§ 22-4131 and 22-4135 (LexisNexis 2010); Utah Code Ann. §§ 78b-401.5, 78b-402 and 78b-9-404 (2002); Va. Code Ann. §§ 19.2-327.10 and 19.2-327-11 (A) (vii) (2008).

Some other jurisdictions have rejected freestanding actual innocence claims as a basis for habeas relief. See, e.g., *Tompkins* v. *State*, 994 So. 2d

Affirmative proof of actual innocence is that which might tend to establish that the petitioner *could not* have committed the crime even though it is unknown who committed the crime, that a *third party* committed the crime or that *no* crime actually occurred. See, e.g., *Miller* v. *Commissioner of Correction*, supra, 242 Conn. 758–59 (third party confession); *Summerville* v. *Warden*, supra, 229 Conn. 420 (discussing colorable but unsuccessful claim that no crime occurred in light of new expert opinion that cause of victim's death was acute cocaine intoxication, not asphyxiation from manual strangulation, and marks on victim's neck could have been caused by resuscitation efforts); *People* v. *Molstad*, 101 Ill. 2d 128, 132–37, 461 N.E.2d 398 (1984) (granting relief after petitioner presented affidavits from four convicted codefendants and one acquitted codefendant stating that petitioner had not been present at crime); *People* v. *Wheeler-Whichard*, 25 Misc. 3d 690, 694–95, 702–703, 884 N.Y.S.2d 304 (2009) (relief afforded when several witnesses credibly provided alibi for petitioner); *Ex parte Elizando*, 947 S.W.2d 202, 210

1072, 1089 (Fla. 2008); *State* v. *El-Tabech*, 259 Neb. 509, 526–27, 610 N.W.2d 737 (2000); *State* v. *Harrington*, 172 Ohio App. 3d 595, 602, 876 N.E.2d 626 (2007); *State ex rel. Smith* v. *McBride*, 224 W. Va. 196, 208 n.44, 681 S.E.2d 81 (2009); see also *Boyles* v. *Weber*, 677 N.W.2d 531, 537–38 (S.D. 2004) (implicitly rejecting freestanding actual innocence claim). The United States Supreme Court has left open the question of whether federal habeas relief is available on the basis of a freestanding claim of actual innocence. See *House* v. *Warden*, 547 U.S. 518, 554–55, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006) ("[The petitioner] urges the [c]ourt to answer the question left open in *Herrera* [v. *Collins*, 506 U.S. 390, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993)] and hold not only that free-standing innocence claims are possible but also that he has established one. We decline to resolve this issue. We conclude here, much as in *Herrera*, that whatever burden a hypothetical free-standing innocence claim would require, this petitioner has not satisfied it.").

Some jurisdictions have not been confronted with this question, perhaps because approximately one third of the states have a statute or rule that sets no time limit, or one that can be waived, to petition for a new trial based on newly discovered evidence. See *Herrera* v. *Collins*, supra, 506 U.S. 410–11 and n.11 (identifying fifteen jurisdictions); see also Fla. R. Crim. Proc. 3.850 (a) (6) and (b) (1); Wash. Rev. Code Ann. § 10.73.100 (West 2002).

(Tex. Crim. App. 1996) (relief afforded when "[the victim's] recantation [of testimony that a crime occurred] not only voids his trial testimony which implicated the [petitioner], but constitutes affirmative evidence of [the petitioner's] innocence"). Clear and convincing proof of actual innocence does not, however, require the petitioner to establish that his or her guilt is a factual impossibility. See *Turner* v. *Commonwealth*, supra, 56 Va. App. 410 n.7 (rejecting proposition that only irrefutable scientific evidence like DNA can be used to prove actual innocence); see also *Miller* v. *Commissioner of Correction*, supra, 801 (rejecting respondent's attempt to prescribe standard that would "cabin the particular type of evidence that must underlie the finding of innocence").

Recantations of inculpatory criminal trial testimony undoubtedly are relevant to a determination of actual innocence. But evidence of that nature must be accompanied by *affirmative* evidence of innocence to meet *Miller*'s standard of clear and convincing evidence of actual innocence. A recent case from the Supreme Court of Missouri is illustrative. The petitioner was convicted on the basis of the testimony of three purported eyewitnesses to the crime who had identified the petitioner as the perpetrator. *State ex rel. Amrine* v. *Roper*, 102 S.W.3d 541, 544 (Mo. 2003). No physical evidence linked the petitioner to the crime. Id. At his habeas trial, the petitioner proffered recantations from all three witnesses. Id., 544–45. Significantly, although the petitioner presented no affirmative evidence of innocence at the *habeas* trial, he had produced alibi witnesses and eyewitnesses to the crime who inculpated a third party at the criminal trial. Id., 548. Thus, the entire record from both the criminal and the habeas trials clearly and convincingly established the petitioner's actual innocence. See *Miller* v. *Commissioner of Correction*, supra, 242 Conn. 747 (noting that first prong of *Miller* test "tak[es] into account all of the evidence—both the

evidence adduced at the original criminal trial and the evidence adduced at the habeas corpus trial").

With these principles in mind, we turn to the question of whether the habeas court in the present case applied the proper standard when concluding that the petitioners had met their burden of proof on their claims of actual innocence. Our review of that decision makes clear that the habeas court's finding of actual innocence rested essentially on the recantation by Stiles, with Boyd's recantation considered to a lesser extent. Indeed, the habeas court characterized the claims as ones "premised almost entirely, if not solely, on a recantation." Because the recantations in the present case, in and of themselves, cannot affirmatively demonstrate that the petitioners did not commit the crimes of which they were convicted, the habeas court's reliance on the recantations reflects that it did not apply the proper standard under *Miller*.

Although the petitioners claim that new evidence also inculpated DeLeon, the habeas court viewed that evidence equivocally and as relevant only to the extent that it related to the credibility of Stiles' recantation. It first stated: "The petitioners were also able to present credible evidence at the habeas trial that *seemingly* implicates [DeLeon] as a *possible* perpetrator of the crime." (Emphasis added.) The habeas court then pointed out that no forensic evidence directly had tied DeLeon to the murder, including DNA on the sample of the cord tested. Significantly, the habeas court ultimately found: "The real import of the 'third party culpability' evidence is *not* that it establishes that someone else committed the crime, but that it shows that the New Haven police department seized upon the false testimony of . . . Stiles and then used it to essentially mark the case as cleared." (Emphasis in original.)

The petitioners also point to an audiotaped interview of Youmans by their investigator, which they claim

lends support to their theory that DeLeon murdered Vega and that Youmans was present when the murder occurred. See footnote 12 of this opinion. The habeas court made no findings, however, as to the credibility or import of Youmans' statements on that tape, or another taped interview that was consistent with Youmans' criminal trial testimony in which she stated that she had left the store before the shooting and had no knowledge of who had committed the crime. Nonetheless, the petitioners suggested at oral argument that this court could consider the audiotape on which they rely to support the habeas court's finding. They point to our statement in *Miller* that "[t]he appropriate scope of review [for the first prong] is whether, after an independent and scrupulous examination of the entire record, we are convinced that the finding of the habeas court that the petitioner is actually innocent is supported by substantial evidence." *Miller* v. *Commissioner of Correction,* supra, 242 Conn. 803. The petitioners misunderstand the nature of our examination of the record.

Appellate courts never act as finders of fact. *State* v. *Parker,* 295 Conn. 825, 852 n.22, 992 A.2d 1103 (2010); *Claveloux* v. *Downtown Racquet Club Associates,* 246 Conn. 626, 633, 717 A.2d 1205 (1998). When a witness presents conflicting testimony, a question of credibility arises that must be assessed by the trier of fact. *Fleming* v. *Bridgeport,* 284 Conn. 502, 515–16, 935 A.2d 126 (2007); *Greco* v. *Greco,* 275 Conn. 348, 359, 880 A.2d 872 (2005). We cannot presume, in the absence of any indication by the habeas court, that it reasonably could have credited one version over another, or even that it construed Youmans' comments as the petitioners do.

In sum, the recantations by Stiles and Boyd may demonstrate that there no longer is any credible evidence that the petitioners did commit the crimes of which they were convicted. What the habeas court's decision lacks is any discussion of affirmative evidence that

would prove by clear and convincing evidence that the petitioners did *not* commit the crimes. We therefore conclude that the habeas court's judgments must be reversed and the cases must be remanded for consideration of the petitions under the proper application of the *Miller* standard.

In so concluding, we are mindful that it may seem unjust to allow a conviction to stand when the evidence on which the conviction rested has been discredited. It must be remembered, however, that, once properly convicted, the petitioners no longer are cloaked in the mantle of the presumption of innocence. See *Summerville* v. *Warden,* supra, 229 Conn. 422–24 ("It is undoubtedly true that [a] person when first charged with a crime is entitled to a presumption of innocence, and may insist that his guilt be established beyond a reasonable doubt. . . . The presumption of innocence, however, does not outlast the judgment of conviction at trial. Once a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears. . . . Any other conclusion would be inconsistent with the fact that our habeas corpus jurisprudence places a heavy burden on the petitioner to establish that, notwithstanding his conviction, he is entitled to a new trial." [Citations omitted; internal quotation marks omitted.]). Discrediting the evidence on which the conviction rested does not revive the *presumption* of innocence. To disturb a long settled and properly obtained judgment of conviction, and thus put the state to the task of reproving its case many years later, the petitioners must affirmatively demonstrate that they are *in fact* innocent.

We underscore, however, what is not at issue in the present case. First, this case is not one in which there was irrefutable evidence that Stiles could not have seen or heard the petitioners at the crime scene. For exam-

ple, there was no videotape of Stiles at another location at the time the crime occurred. Had there been such evidence, this case would not simply be one in which no reasonable juror *would* find the petitioners guilty. Rather, it would be a case in which no reasonable juror *could*, as a matter of law, find the petitioners guilty. Under circumstances where new, irrefutable evidence is produced that so completely eviscerates the prosecution's case such that the state would have no evidence to go forward with upon retrial, perhaps a functional equivalent to actual innocence might credibly be claimed. Indeed, such an approach might be reconciled with the statutory limitation period for filing a petition for a new trial on the basis of newly discovered evidence because DNA, one form of irrefutable exculpatory evidence, is not subject to the statute of limitations. See General Statutes § 52-582.

Unlike such irrefutable evidence, however, the habeas court's decision in the present case rests on a witness' recantation of sworn testimony. Although a recantation that provides affirmative evidence that a petitioner did not commit the crime may constitute sufficient proof to establish actual innocence; see, e.g., *Ex parte Elizando*, supra, 947 S.W.2d 210; it is important to underscore that courts universally view recantation evidence with a healthy dose of skepticism.[17] See *Chan-*

[17] In addition to concerns expressed by some courts as to improper influences, such as coercion or duress, that may cause a witness to recant; *State* v. *Hogan*, 144 N.J. 216, 239, 676 A.2d 533 (1996); *Carpitcher* v. *Commonwealth*, 273 Va. 335, 346, 641 S.E.2d 486 (2007); this court noted a more sympathetic motive that can come into play: "After the trial is over and the accused stands convicted, with the heavy penalty of the law impending and just ready to fall upon him, how easy by artful or even honest suggestion to awaken a sympathy even in the heart of the victim, who was the main, perhaps only witness against the accused, and who naturally feels responsible for the conviction; and how easy for such witness by a process of speculation, colored by feeling, to feel and express a doubt about the correctness of the opinion entertained at the time of the transaction." *Shields* v. *State*, 45 Conn. 266, 270 (1877); see also *Johnson* v. *State*, 36 Conn. App. 59, 69, 647 A.2d 373 (distinguishing sympathetic motive for recantation with

*ner* v. *State*, 54 Conn. App. 620, 629, 738 A.2d 202, cert. denied, 251 Conn. 910, 739 A.2d 1247 (1999); *People* v. *Morgan*, 212 Ill. 2d 148, 155, 162–63, 817 N.E.2d 524 (2004); *Case* v. *Hatch*, 144 N.M. 20, 23–26, 183 P.3d 905 (2008); *People* v. *Cintron*, 306 App. Div. 2d 151, 152, 763 N.Y.S.2d 11, cert. denied, 100 N.Y.2d 641, 801 N.E.2d 428, 769 N.Y.S.2d 207 (2003); *Commonwealth* v. *D'Amato*, 579 Pa. 490, 522, 856 A.2d 806 (2004); *In re Carpitcher*, 47 Va. App. 513, 526, 624 S.E.2d 700 (2006), aff'd, 273 Va. 335, 641 S.E.2d 486 (2007); *Brown* v. *State*, 816 P.2d 818, 822–23 (Wyo. 1991). Indeed, it is not unprecedented for a witness to recant a recantation. See, e.g., *Carriger* v. *Stewart*, supra, 132 F.3d 484; *In re Roberts*, 29 Cal. 4th 726, 738, 60 P.3d 165, 128 Cal. Rptr. 2d 762 (2003); *State* v. *Lincoln*, 71 Haw. 274, 276, 789 P.2d 497 (1990); *People* v. *Fernandez*, 58 App. Div. 3d 494, 495, 870 N.Y.S.2d 351, leave to appeal denied, 12 N.Y.3d 915, 912 N.E.2d 1077, 884 N.Y.S.2d 696 (2009); *State* v. *Robillard*, 146 Vt. 623, 629, 508 A.2d 709 (1986); *Lewis* v. *Commonwealth*, 193 Va. 612, 626, 70 S.E.2d 293, cert. denied, 344 U.S. 880, 73 S. Ct. 177, 97 L. Ed. 681 (1952). Accordingly, if the state were to retry the petitioners, a jury would not be required, as a matter of law, to credit Stiles' recantation.

Second, the petitioners have not claimed on appeal that the fact that their convictions rest on what the habeas court deemed to be perjured testimony is an independent basis for habeas relief. The petitioners' appellate brief cites cases from the United States Court of Appeals for the Second Circuit for the more general proposition that "[f]ew rules are more central to an accurate determination of innocence or guilt . . . than the requirement . . . that one should not be convicted on false testimony." (Citations omitted; internal quota-

---

situation in which "recanter admits to knowingly perjuring himself at trial and now allegedly wants to 'come clean' "), cert. denied, 231 Conn. 946, 653 A.2d 827 (1994).

tion marks omitted.) *Sanders* v. *Sullivan*, 900 F.2d 601, 607 (2d Cir. 1990); accord *Ortega* v. *Duncan*, 333 F.3d 102, 109 (2d Cir. 2003). As the respondent pointed out in his reply brief, these cases are ones in which that court has taken a position adopted by a minority of jurisdictions that even a prosecutor's *unknowing* use of perjured testimony can violate due process.[18] At oral

---

[18] As this court has recognized, it is settled law that "the knowing presentation of false evidence by the state is incompatible with the rudimentary demands of justice. . . . Furthermore, due process is similarly offended if the state, although not soliciting false evidence, allows it to go uncorrected when it appears." (Citations omitted; internal quotation marks omitted.) *State* v. *Paradise*, 213 Conn. 388, 399–400, 567 A.2d 1221 (1990), overruled in part on other grounds by *State* v. *Skakel*, 276 Conn. 633, 693, 888 A.2d 985 (2006), cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2008).

The New Mexico Supreme Court has noted: "The issue of whether a petitioner is entitled to habeas corpus relief when the petitioner raises due process implications from the alleged unknowing use of perjured testimony by the prosecution is unsettled. The United States Supreme Court has not addressed the issue. *Evenstad* v. *Carlson*, 470 F.3d 777, 783 (8th Cir. 2006). In *Durley* v. *Mayo*, [351 U.S. 277, 291, 76 S. Ct. 806, 100 L. Ed. 1178 (1956) (Douglas, J., dissenting)] however, four [j]ustices would have held that '[d]eprivation of a [habeas corpus] hearing under these circumstances amounts . . . to a denial of due process of law.' . . . The majority never reached the question, instead dismissing for lack of jurisdiction. [Id., 285]. More recently, Justices Stevens and Ginsburg made the same argument in their opposition to a denial of certiorari. *Jacobs* v. *Scott*, 513 U.S. [1067], 115 S. Ct. 711, 130 L. Ed. 2d 618 (1995) (Stevens and Ginsburg, Js., dissenting).

"A majority of the federal circuit courts require a knowing use of perjured testimony by the prosecution to find a violation of due process. *Sanders* [v. *Sullivan*, supra, 863 F.2d 222] (citing cases from the Third, Fifth, Sixth, Seventh, Ninth, Tenth, and Eleventh Circuit Courts of [Appeals]). The Second Circuit in *Sanders* found that due process rights may be implicated [even by an unknowing use of perjured testimony] 'when a credible recantation of the testimony in question would most likely change the outcome of the trial and a state leaves the conviction in place.' " *Case* v. *Hatch*, supra, 144 N.M. 25. State courts are divided on this issue. See *Commonwealth* v. *Spaulding*, 991 S.W.2d 651, 657 (Ky. 1999) (due process violation for unknowing use); *Riley* v. *State*, 93 Nev. 461, 462, 567 P.2d 475 (1977) (same); *Case* v. *Hatch*, supra, 25–26 (same); *People* v. *Yamin*, 45 Misc. 2d 407, 416–17, 257 N.Y.S.2d 11 (1965) (same); *Ex parte Napper*, 322 S.W.3d 202, 242 (Tex. Crim. App. 2010) (same); see also *Bean* v. *State*, 119 Idaho 645, 648–49, 809 P.2d 506 (App. 1990) (affording postconviction relief under statute permitting vacation of conviction in interests of justice), aff'd with modification, 119 Idaho 632, 809 P.2d 493 (1991); Cal. Penal Code § 1473 (b) and (c) (Deering 2008) (providing habeas relief for conviction based on material false testi-

argument before this court, the petitioners did not challenge the respondent's contention that they had not asserted, or adequately briefed, a due process claim as an alternative ground on which to affirm the habeas court's judgment. Upon this court's inquiries, however, the respondent opined that the habeas court would have discretion to allow the petitioners to amend their petition to advance such a claim upon remand, if they so choose. Therefore, the question of whether the petitioners could obtain relief on such a basis is not presently before us.

Accordingly, the petitions must be reconsidered under the proper standard. We note that Taylor's habeas counsel recently has informed this court that Taylor is terminally ill. Therefore, we direct the habeas court to conduct a new trial on this matter as expeditiously as possible.

The judgments are reversed and the cases are remanded to the habeas court for a new trial.

In this opinion the other justices concurred.

PALMER, J., concurring. I fully agree with and join the majority's well reasoned opinion in which it concludes that the habeas court failed to apply the proper standard for assessing a claim of actual innocence under *Miller* v. *Commissioner of Correction*, 242 Conn. 745, 700 A.2d 1108 (1997). I further agree that this deficiency arises from the habeas court's exclusive reliance on recantations of testimony from the criminal trials

---

mony, irrespective of whether prosecution knew or should have known of falsity). But see *People* v. *Brown*, 169 Ill. 2d 94, 104–106, 660 N.E.2d 964 (1995) (acknowledging split of authority and explaining reason for limiting relief to cases in which there is knowledge by state); *State* v. *Lotter*, 278 Neb. 466, 479–81, 771 N.W.2d 551 (2009) (no due process violation without state's knowledge of falsity), cert. denied, 559 U.S. 1014, 130 S. Ct. 1900, 176 L. Ed. 2d 378 (2010); *State* v. *Thiel*, 515 N.W.2d 186, 191 (N.D. 1994) (same). This court has not addressed this question.

of the petitioners, George M. Gould and Ronald Taylor. For the reasons that the majority persuasively advances, in order to establish their actual innocence, the petitioners were required to produce affirmative evidence that they did not commit the crimes of which they were convicted. I write separately simply to express my view regarding one avenue by which I believe the petitioners potentially could meet this burden upon retrial.

Inasmuch as habeas relief on the basis of actual innocence is reserved for a truly extraordinary case in which a clear miscarriage of justice is demonstrated; see *Summerville* v. *Warden*, 229 Conn. 397, 421–22, 641 A.2d 1356 (1994); the present cases reflect an unusual, indeed almost unprecedented, situation that raises the possibility that such a miscarriage may have occurred. We have before us two cases in which the habeas court found credible the recantations of the only state witnesses to link the petitioners to the crimes of which they were convicted, thus effectively negating the only evidence that supported their convictions. This evidentiary lacunae, in my view, raises the exceptional situation in which the petitioners should be permitted to provide affirmative proof of their innocence through their own testimony. If the petitioners can offer testimony that, in the view of a habeas court, constitutes clear and convincing proof of their innocence, I see no reason why, given the absence of any remaining credible evidence of their guilt,[1] the petitioners should not be deemed to have met their burden under *Miller*.[2]

---

[1] My analysis is predicated on the presumption that, for purposes of retrial, the recantation testimony proffered by the petitioners is deemed to be highly credible.

[2] Like the majority, I also would leave open the possibility that the petitioners could amend their habeas petitions to advance a claim that their convictions were predicated on perjured testimony in violation of their right to due process.

As the majority properly observes, clear and convincing proof of actual innocence does not require a petitioner to establish that his or her guilt is a factual impossibility. See *Turner* v. *Commonwealth*, 56 Va. App. 391, 410 n.7, 694 S.E.2d 251 (2010) (rejecting proposition that only irrefutable scientific evidence such as DNA can be used to prove actual innocence), appeal granted, Docket No. 101457, 2011 Va. LEXIS 9 (Va. January 7, 2011). In *Miller*, this court was careful not "to cabin the particular type of evidence that must underlie the finding of innocence." *Miller* v. *Commissioner of Correction*, supra, 242 Conn. 801. Indeed, consistent with the rejection of such categorical rules, this court previously held that the state properly established guilt beyond a reasonable doubt solely on the basis of an *uncorroborated* statement given to the police by a witness who subsequently retracted the statement.[3] See *State* v. *Newsome*, 238 Conn. 588, 601, 611–12, 682 A.2d 972 (1996). If such uncorroborated hearsay evidence can suffice to meet the highest possible evidentiary standard, I see no reason why a habeas petitioner's highly credible denial of his or her participation in the crime, together with the highly credible recantation testimony of the critical state witness, could not satisfy the lesser, although undoubtedly stringent, standard of clear and convincing evidence.

I am mindful that, when a petitioner seeks to advance a claim of actual innocence, affirmative proof usually comes in the form of newly discovered eyewitnesses, third party alibis or exculpatory physical evidence, such as DNA. See, e.g., *Schlup* v. *Delo*, 513 U.S. 298, 324, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995) (citing as reliable

---

[3] In *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), this court adopted a rule permitting "the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination." Id., 753.

evidence in support of actual innocence "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence . . . that was not presented at trial"). Nonetheless, it seems clear that this court's application of the *Miller* test must not operate in such a way as to categorically bar relief for petitioners who have been able to negate all evidence of their guilt but, through sheer happenstance, have no ability to produce this particular kind of affirmative evidence of their innocence. Fundamental fairness dictates that a petitioner who is simply unlucky enough to have been alone or with his codefendant when the crime was committed and to have been implicated in a crime for which the perpetrator left no physical evidence should have some means available to demonstrate affirmatively his or her innocence short of proving the identity of the actual perpetrator. In such circumstances, to disallow a petitioner's testimony as self-serving would be to deprive the petitioner of an opportunity to prevail no matter how credible that testimony and the testimony of the recanting witness might be.

I also underscore, however, that the availability of such means would not in any way relieve the petitioner of meeting the high standard of proof set forth in *Miller*. As this court emphasized in that case, the clear and convincing standard is satisfied only "if the evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." (Internal quotation marks omitted.) *Miller* v. *Commissioner of Correction*, supra, 242 Conn. 794. To prove actual innocence by this standard in a factual scenario like the present one, a petitioner must be able to provide, in addition to evidence that effectively negates the state's case, highly persuasive testimony denying his or her involvement in the commission of

the crime, testimony that withstands the rigors of cross-examination. Cf. *People* v. *Wheeler-Whichard*, 25 Misc. 3d 690, 696, 884 N.Y.S.2d 304 (2009). The habeas court would be entitled to view such testimony with the same skepticism that it views recantations. See *Carpitcher* v. *Commonwealth*, 273 Va. 335, 346, 641 S.E.2d 486 (2007) ("recantation evidence . . . is widely viewed by courts with suspicion because of the obvious opportunities and temptations for fraud"); see also *Miller* v. *Commissioner of Correction*, supra, 795 ("the clear and convincing evidence standard should operate as a weighty caution upon the minds of all judges, and it forbids relief whenever the evidence is loose, equivocal or contradictory" [internal quotation marks omitted]). For the very reasons why this court does not categorically bar recantation evidence, however, I would not foreclose the possibility of a petitioner proving actual innocence through his or her own testimony when the petitioner effectively has discredited the state's evidence of guilt.